UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CONSTAR INTERNATIONAL INC., et al.,[1] | ) | Case No. 08-_____ (____) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DISCLOSURE STATEMENT FOR THE DEBTORS'**
**JOINT PLAN OF REORGANIZATION PURSUANT TO**
**CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**DATED DECEMBER 30, 2008**

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN") OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CLAIMHOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE DEADLINE FOR VOTING TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2009, UNLESS EXTENDED. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY SUCH DEADLINE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: Constar International Inc. (XX-XXX9304), BFF, Inc. (XX-XXX1229), DT, Inc. (XX-XXX7693), Constar, Inc. (XX-XXX0950), Constar Foreign Holdings, Inc (XX-XXX8591) and Constar International U.K. Limited. The address of Constar International Inc., BFF, Inc., DT, Inc., Constar, Inc. and Constar Foreign Holdings, Inc. is One Crown Way, Philadelphia, Pennsylvania 19154. The address of Constar International U.K. Limited is Moor Lane Trading Estate, Sherburn in Elmet, Nr Leeds, North Yorkshire LS25 6ES, UK.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS LEADING TO THESE BANKRUPTCY CASES AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE BANKRUPTCY CASES) INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS OR ANY OF THEIR SUBSIDIARIES. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

THE BOARDS OF DIRECTORS OF CONSTAR INTERNATIONAL INC. AND CERTAIN OF ITS WHOLLY-OWNED DIRECT SUBSIDIARIES HAVE UNANIMOUSLY APPROVED THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY AND RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

Prepared By:

BAYARD, P.A.
Neil B. Glassman, Esq. (No. 2087)
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

WILMER CUTLER PICKERING HALE AND DORR LLP
Andrew N. Goldman, Esq. (*pro hac vice* admission pending)
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Eric R. Markus, Esq. (*pro hac vice* admission pending)

1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6733
Facsimile: (202) 663-6363

Attorneys for the Debtors and Debtors in Possession

BAY:01219176v1
US1DOCS 6890484v10

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................................................1

    A.     PURPOSE AND EFFECT OF THE PLAN ................................................................1
    B.     OVERVIEW OF CHAPTER 11 ..................................................................................1
    C.     SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND
           EQUITY INTERESTS UNDER THE PLAN ..............................................................2
    D.     PARTIES ENTITLED TO VOTE ON THE PLAN.....................................................2
    E.     SOLICITATION PACKAGE .......................................................................................3
    F.     VOTING INSTRUCTIONS...........................................................................................3
    G.     THE CONFIRMATION HEARING...............................................................................4
    H.     CONFIRMING AND CONSUMMATING THE PLAN .................................................4

II. BACKGROUND .............................................................................................................................4

    A.     OVERVIEW OF THE COMPANY'S BUSINESS .......................................................4
    B.     THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE ..................................5
    C.     SUMMARY OF PREPETITION INDEBTEDNESS AND OTHER FINANCINGS AS OF THE
           PETITION DATE .......................................................................................................6

III. CHAPTER 11 CASES ...................................................................................................................7

    A.     EVENTS LEADING TO THE CHAPTER 11 CASES .................................................7
    B.     EVENTS OF THE CHAPTER 11 CASES ...................................................................8

IV. THE JOINT PLAN .......................................................................................................................10

    A.     INTRODUCTION........................................................................................................10
    B.     ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS...............................11
    C.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...............11
    D.     TREATMENT OF CLAIMS AND INTERESTS .......................................................12
    E.     SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS .............................13
    F.     ACCEPTANCE OR REJECTION OF THE PLAN ....................................................13
    G.     MEANS FOR IMPLEMENTATION OF THE PLAN .................................................13
    H.     PROVISIONS GOVERNING DISTRIBUTIONS.......................................................16
    I.      PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED
           CLAIMS......................................................................................................................17
    J.      SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............18
    K.     ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS ......21
    L.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN22
    M.    GOVERNING LAW ...................................................................................................23
    N.     REVOCATION, WITHDRAWAL, MODIFICATION OR AMENDMENT OF THE PLAN ......23

V. RETENTION OF JURISDICTION .............................................................................................23

VI. SOLICITATION AND VOTING PROCEDURES ....................................................................25

    A.     THE SOLICITATION PACKAGE.............................................................................25
    B.     VOTING INSTRUCTIONS........................................................................................26
    C.     VOTING TABULATION............................................................................................27
    D.     VOTES SOLICITED IN GOOD FAITH....................................................................28

VII. VALUATION ANALYSIS AND FINANCIAL PROJECTIONS......................................................28

    A.     VALUATION OF THE REORGANIZED DEBTORS..................................28
    B.     FINANCIAL PROJECTIONS ......................................................................30

VIII. CONFIRMATION PROCEDURES ...................................................................................33

    A.     THE CONFIRMATION HEARING..............................................................33
    B.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..............................33
    C.     RISK FACTORS.............................................................................................36
    D.     IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION..................37
    E.     DISCLAIMER ...............................................................................................37

IX. IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF
    REORGANIZED DEBTORS.............................................................................................37

    A.     BOARD OF DIRECTORS AND MANAGEMENT .....................................37
    B.     INDEMNIFICATION OF DIRECTORS AND OFFICERS........................38
    C.     MANAGEMENT INCENTIVE PLAN ........................................................38
    D.     EXIT FINANCING.........................................................................................38
    E.     ISSUANCE OF NEW EQUITY ...................................................................39

X. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND
    CONSUMMATING THE PLAN .......................................................................................39

    A.     GENERAL.....................................................................................................39
    B.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS ...........................39
    C.     FINANCIAL INFORMATION, DISCLAIMER .........................................40
    D.     FACTORS AFFECTING THE DEBTORS ..................................................40
    E.     CERTAIN TAX MATTERS..........................................................................45
    F.     RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE
         INACCURATE ..............................................................................................45
    G.     LIQUIDATION UNDER CHAPTER 7 ........................................................45

XI. SECURITIES LAW MATTERS.........................................................................................46

    A.     PLAN SECURITIES......................................................................................46
    B.     ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN ..............................46
    C.     Termination of Registration of New Equity ................................................47

XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES .......................................47

    A.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
         DEBTORS AND THE REORGANIZED DEBTORS..................................48
    B.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
         HOLDERS OF CLASS 1, CLASS 2, CLASS 3 AND CLASS 5 CLAIMS ..............................49
    C.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
         HOLDERS OF CLASS 4 CLAIMS...............................................................50
    D.     ACCRUED INTEREST..................................................................................50
    E.     MARKET DISCOUNT..................................................................................50

XIII. CONCLUSION AND RECOMMENDATION ................................................................51

## EXHIBITS

| | | |
|---|---|---|
| **Exhibit A** | - | Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code |
| **Exhibit B** | - | Liquidation Analysis |

# I. INTRODUCTION

The Debtors hereby submit this disclosure statement (the "Disclosure Statement")[2] pursuant to section 1125 of Title 11, United States Code §§ 101 *et. seq.* (the "Bankruptcy Code") in connection with the solicitation of acceptances of the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* dated December 30, 2008, as the same may be amended from time to time (the "Plan"). A copy of the Plan is attached hereto as <u>Exhibit A</u>.

## A.    PURPOSE AND EFFECT OF THE PLAN

The primary purpose of the Plan is to effectuate the following restructuring transactions:

(a)    Constar will offer to exchange 100 shares of common equity of the Company ("New Equity") for every $1,000 of principal amount of the 11% Senior Subordinated Notes due 2012 (the "Senior Subordinated Notes"). On the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Senior Subordinated Notes, each Holder of such Senior Subordinated Note Claims (the "Senior Subordinated Noteholders") shall receive his Pro Rata portion of the Distribution Shares.

(b)    On the Effective Date, all Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Equity Interests; and

(c)    The Debtors shall either (i) convert the DIP Facility into an Exit Facility on the Conversion Date; or (ii) if the Debtors elect not to convert the DIP Facility and have negotiated an Alternative Exit Facility sufficient to repay in full the DIP Facility and to fund the Debtors' operations, upon the Effective Date, the Debtors shall enter into such Alternative Exit Facility. The Exit Facility may be used for any purpose permitted thereunder.

## B.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date (the "Petition Date"). The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

A "prearranged" plan of reorganization is one in which the debtor negotiates the terms of the plan of reorganization with certain affected creditors before filing for bankruptcy. Solicitation of acceptances then take place shortly after the bankruptcy filing. Because negotiation of the terms of the plan take place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prearranged bankruptcy cases.

---

[2]    Unless otherwise defined in this Disclosure Statement, all capitalized terms used but not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

C. **SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

The following chart summarizes distributions to Holders of Allowed Claims and Equity Interests under the Plan.[3] The recoveries set forth below are projected recoveries and may change based upon changes in Allowed Claims and proceeds available.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|-------|----------------------|-----------------------------------|------------------------------------------------------------------|
| 1 | Other Priority Claims | Unimpaired | 100.00% |
| 2 | Senior Secured FRN Claims | Unimpaired | 100.00% |
| 3 | Other Secured Claims | Unimpaired | 100.00% |
| 4 | Senior Subordinated Note Claims | Impaired | Pro rata share of New Equity |
| 5 | Other General Unsecured Claims[4] | Unimpaired | 100.00% |
| 6 | Section 510(b) Claims | Impaired | 0% |
| 7 | Equity Interests | Impaired | 0% |

D. **PARTIES ENTITLED TO VOTE ON THE PLAN**

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan. Holders of Claims not impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Equity Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Senior Secured FRN Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Senior Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims[5] | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

For a detailed description of the Classes of Claims and the Classes of Equity Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

---

[3] This chart is only a summary of the classification and treatment of Allowed Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.

[4] Distributions to this Class will include cure amounts, if any, due on contracts the Debtors are assuming pursuant to the Plan.

[5] Distributions to this Class will include cure amounts, if any, due on contracts the Debtors are assuming pursuant to the Plan.

E.    **SOLICITATION PACKAGE**

The following materials constitute the Solicitation Package:

- the appropriate Ballot and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Disclosure Statement with all exhibits, including the Plan.

The above are collectively referred to as the solicitation package (the "Solicitation Package").

The Debtors have engaged Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, Third Floor, New York, NY 10017, as their claims and noticing agent and as their voting agent (the "Voting Agent") to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

The Core Group,[6] and all parties entitled to vote to accept or reject the Plan shall be served either paper copies or a CD-ROM containing the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan. Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Debtors' Voting Agent (as defined below) by writing to Epiq Bankruptcy Solutions, LLC, c/o Constar Ballot Processing, 757 Third Avenue, Third Floor, New York, NY 10017, or calling (646) 282-2500. The Solicitation Package (except the Ballots) can also be obtained by accessing the Voting Agent's website, http://chapter11.epiqsystems.com. All parties entitled to vote to accept or reject the Plan shall receive a Solicitation Package containing paper copies of an appropriate Ballot.

The Plan Supplement will be Filed by the Debtors no later than fourteen days before the date of the Confirmation Hearing (the "Plan Supplement Filing Date"). When Filed, the Plan Supplement shall be made available on the Voting Agent's website at http://chapter11.epiqsystems.com. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement. However, parties may request a copy of the Plan Supplement from the Debtors' Voting Agent.

F.    **VOTING INSTRUCTIONS**

Only the Holders of Class 4 Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and returning it to the Debtors' Voting Agent no later than 4:00 p.m., prevailing Eastern Time, on _____, 2009 (the "Voting Deadline"). Ballots received after that time will not be counted, except to the extent the Debtors so determine or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018.

Holders of Class 4 Claims are required to send an original signed copy of the Ballot by U.S. first class mail or overnight delivery to the address set forth by the pre-addressed envelope provided to the Voting Agent. For purposes of determining compliance with the Voting deadline, the time at which the Ballot is received is the time at which the ballot is **actually received** by the Voting Agent. Voting Instructions are attached to each Ballot. The Voting Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") as soon as practicable before the Confirmation Hearing.

All ballots must be sent to the Voting Agent at the following address:

---

[6]    "Core Group" means (i) counsel to the Ad Hoc Committee of Senior Subordinated Noteholders, (ii) counsel to the administrative agent for the DIP Lenders, (iii) the United States Trustee, (iv) the indenture trustee for Senior Secured FRNs, (v) counsel to Creditors' Committee (once appointed), and (vi) the indenture trustee for the Senior Subordinated Notes.

All votes to accept or reject the Plan must be cast by using a ballot. Votes which are cast in any manner other than by using a ballot will not be counted.

**ANY BALLOT THAT FAILS TO CLEARLY INDICATE AN ACCEPTANCE OR REJECTION, OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL BE TREATED AS AN AFFIRMATIVE VOTE.**

**EACH HOLDER OF A CLASS 4 CLAIM MUST VOTE ALL OF THEIR CLAIMS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASS 4 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIMS, THEN ANY SUCH EARLIER BALLOTS ARE REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

G.     **THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

The Debtors intend to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

H.     **CONFIRMING AND CONSUMMATING THE PLAN**

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Agent. In addition, certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of Article X of the Plan.

Following Confirmation, the Plan will be consummated on the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article X of the Plan have been (i) satisfied or (ii) waived pursuant to Article X of the Plan (the "Effective Date").

For further information, see Article IV hereof - "THE JOINT PLAN" - Conditions Precedent to Confirmation and Consummation of the Plan."

## II. BACKGROUND

A.     **OVERVIEW OF THE COMPANY'S BUSINESS**

Constar International Inc., a Delaware corporation ("Constar"), and its subsidiaries are a global producer of and one of the largest North American suppliers of polyethylene terephthalate ("PET") plastic containers for conventional PET applications, primarily designed and manufactured for soft drinks and water. Constar also has an

expanding position in the growing custom PET market, designed for food, juices, teas, sport drinks, new age beverages and beer.

Constar was a major international participant in the rapid growth of two-liter PET soft drink bottles in the early 1980s, the introduction of single serve soft drink bottles for convenience sales in the 1990s, and the development of the bottled water market. Headquartered in Philadelphia, Pennsylvania, Constar employed 1,746 employees as of December 31, 2007, with 1,535 workers in the United States and 211 workers in Europe. Constar currently has 13 plants in the United States, and 2 plants in Europe.

Constar manufactures PET containers for two product types: conventional PET and custom PET. The conventional PET container business consists of high volume production of containers for use in packaging soft drinks and water. In 2007, conventional PET products represented approximately 74% of Constar's sales. In contrast, custom PET container applications include food, juices, teas, sport drinks, new age beverages, household chemicals, beer and flavored alcoholic beverages. The containers for custom PET applications generally require more complex manufacturing processes, unique materials, innovative product designs and technological know-how. Custom PET products represented approximately 22% of Constar's sales in 2007. Constar also produces plastic closures and other non-PET containers, representing approximately 4% of sales in 2007.

Constar primarily manufactures and sells bottles in the United States and preforms7 in Europe. Approximately 78% of Constar's 2007 revenue was attributable to sales in the United States and the remainder was attributable to sales in Europe. Constar's customers are global, international consumers of Constar products who rely on the interconnected nature of Constar's business to supply them.

Generally, Constar supplies its customers (both domestic and international) pursuant to contracts with terms of one year or longer. Substantially all of Constar's sales are under contracts containing provisions that allow for the pass-through of changes in the price of PET resin, the primary raw material and component cost of Constar's products, under various timing mechanisms.

Constar's top global customer, Pepsi, accounted for approximately 38% of its sales in 2007. On October 10, 2008, the Company executed a new four-year cold fill supply agreement with Pepsi. Under the terms of this new agreement, effective January 1, 2009, the Company expects that there will be an approximately 30% reduction in cold fill volume as compared to 2008 with a shift towards fewer bottles and more preforms, but on improved economic terms. The new agreement with Pepsi provides the Company with the exclusive right to supply, subject to certain exceptions, 100% of the volume required at specified Pepsi filling locations. The term of the new agreement may be extended for a fifth year at Pepsi's option.

## B.     THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

Constar is the parent of four wholly-owned subsidiaries: BFF, Inc., a Delaware corporation, DT, Inc., a Delaware corporation, Constar, Inc., a Pennsylvania corporation, and Constar Foreign Holdings, Inc., a Delaware corporation ("Holdings"). Holdings, in turn, is the parent of three wholly-owned foreign subsidiaries: Constar International Holland (Plastics) B.V., a Dutch *besloten vennootschap* ("Constar Holland"), Constar Plastics of Italy S.r.l., an Italian *società responsabiliàt* ("Constar Italy"), and Constar International U.K. Limited, a United Kingdom limited company ("Constar UK").

Constar was an independent publicly-held corporation from 1969 until 1992, when it was purchased by Crown Cork & Seal Company, Inc. ("Crown") and became a wholly-owned subsidiary of Crown. On November 20, 2002, Crown sold 10.5 million shares of its stock in Constar, comprising most of its equity in the company, through an initial public offering (the "IPO"). Since the IPO, Constar has again been a public company and its common stock has been listed on the National Market System of The NASDAQ Stock Market (now known as the NASDAQ Global Market ("NASDAQ")) under the symbol "CNST." As of December 31, 2007, Crown owned 1,255,000 shares, or approximately 10%, of Constar's common stock.

---

7       Preforms are test-tube shaped intermediate products in certain blow-molding applications.

As of November 10, 2008, 12,952,309 shares of Constar's Common Stock were issued and outstanding. There are no shares of preferred stock issued or outstanding. On September 10, 2008, Constar was given notice by NASDAQ that for 30 consecutive trading days its common stock had not maintained a minimum market value of publicly held shares of $15 million as required for continued listing as set forth in Marketplace Rule 4450(b)(3).[8]

## C.  SUMMARY OF PREPETITION INDEBTEDNESS AND OTHER FINANCINGS AS OF THE PETITION DATE

Concurrently with the IPO, on November 20, 2002, Constar completed a public offering of $175 million aggregate principal amount of 11% Senior Subordinated Notes (the "Senior Subordinated Notes"). The Senior Subordinated Notes were issued at 98.51% of face value and mature on December 1, 2012, with interest payable semi-annually. The Company also entered into a $250 million senior secured credit facility consisting of a $150 million seven-year term loan and a $100 million five-year revolving loan facility. Constar used the proceeds from the subordinated note offering and the term loan arrangement to repay inter-company indebtedness owed to Crown.

On February 11, 2005, Constar completed a refinancing which consisted of the sale of $220 million aggregate principal amount of Senior Secured Floating Rate Notes due 2012 (the "Senior Secured FRNs") and simultaneously entered into a four-year $70 million Senior Secured Asset Based Revolving Credit Facility with Citicorp USA, Inc. as Administrative Agent and certain other Lenders (the "ABR Facility"). The proceeds, net of expenses, from the refinancing were used to repay $30 million outstanding under Constar's former revolving loan facility and $197 million then outstanding under two term loans.

Under the ABR Facility, Constar has pledged as collateral all of the capital stock of its domestic and United Kingdom subsidiaries and 65% of the voting stock of its other foreign subsidiaries, as well as all of the inventory, accounts receivable, investment property, instruments, chattel paper, documents, deposit accounts and certain intangibles of Constar and its U.K. subsidiaries. On March 20, 2007, Constar amended the ABR Facility to, among other things, increase the facility to $75 million, lower interest charges by 50 basis points, lower excess collateral availability from $20 million to $15 million and extend the termination date to February 11, 2012. The ABR Facility is not secured by any of the collateral which secures the Senior Secured FRNs; they are separate collateral pools.

The Senior Secured FRNs, which remain outstanding, bear interest at a rate of LIBOR plus 3.375%, with interest payable quarterly and principal maturing February 15, 2012. Pursuant to an interest rate swap executed in May 2005 with Citigroup Financial Products Inc., $100 million face amount of the Senior Secured FRNs had an effective fixed interest rate of 7.9%. The Senior Secured FRNs are secured by certain collateral of the Debtors as defined in the Senior Secured FRN Indenture and related security documents, but not by any of the collateral which secures the ABR Facility.

As of the Petition Date, the Debtors' prepetition indebtedness for borrowed money consists of:

- $220 million in principal amount of debt consisting of the Senior Secured FRNs, bearing interest at LIBOR plus 3.375% per annum (as noted above, the Debtors have a swap agreement which effectively fixes the interest rate for $100 million of this series of Senior Secured FRNs at 7.9%);

---

[8]     This notification has no present effect on the listing of Constar's common stock. In accordance with Marketplace Rule 4450(e)(1), the Company was provided 90 calendar days, or until December 10, 2008, to regain compliance with the Rule. Due to the unprecedented market conditions that occurred in September and October, NASDAQ determined to toll delistings under Marketplace Rule 4450(b)(3) until January 19, 2009. As a result of this tolling, Constar will have until March 16, 2009 in which to regain compliance with Marketplace Rule 4450(b)(3). If at any time prior to such date the market value of Constar's publicly held shares is $15 million or more for ten consecutive trading days, the NASDAQ staff will provide written notification to Constar that it has achieved compliance. If compliance with the Rule cannot be demonstrated by March 16, 2009, the Nasdaq staff will provide written notification to Constar that its securities will be delisted from the NASDAQ Global Market. At that time, Constar may appeal the Staff's determination to a Listing Qualifications Panel.

- $175 million in principal amount of debt consisting of the Senior Subordinated Notes, bearing interest at 11% per annum; and

as of December 17, 2008:

- Approximately $23 million of borrowings under the ABR Facility, bearing interest at LIBOR plus 2.25% per annum;[9] and

- Approximately $6.1 million outstanding under undrawn letters of credit.

## III. CHAPTER 11 CASES

### A. EVENTS LEADING TO THE CHAPTER 11 CASES

Over the past few years, a number of factors have caused Constar's revenues to decline and its net losses to increase, which events in turn, adversely affected Constar's ability to generate profits in the future. These factors include declining consumer demand for carbonated beverages and bottled water, the continuing shift of Constar's customers to self-manufacturing, the rising cost of resin, and the loss of some customers.

#### 1. DECLINING CONSUMER DEMAND FOR CARBONATED BEVERAGES AND BOTTLED WATER AND ITS EFFECT ON THE DEBTORS' BUSINESSES

Constar's conventional product profitability is driven principally by price, volume and maintaining efficient manufacturing operations. Approximately 74% of Constar's sales in 2007 related to conventional PET containers which are primarily used for carbonated soft drinks and bottled water. Due to recent macroeconomic conditions, especially the marked slow down in the U.S. and European economies, fears of a broad and deep worldwide recession and the historically high gasoline prices that prevailed until recently, Constar's customers experienced weak demand in the convenience store and gas station distribution channels, where a high percentage of PET products are sold, and this has negatively impacted Constar's sales to soft drink and water manufacturers.

#### 2. SHIFT TO SELF-MANUFACTURING AND ITS EFFECT ON THE DEBTORS' BUSINESSES

Additionally, Constar's conventional unit volume has declined (by 4.2% in the past year) due to the continued movement of water bottlers to self-manufacturing, as well as consumers shifting their preferences from carbonated soft drinks to energy drinks and teas. The shift is expected to continue among water bottlers both due to economic and competitive factors at the retail level, as well as the fact that several water bottlers may either be consolidated or go out of business. As a result, profitability from bottled water bottle sales has declined and is expected to decline further in the future. Customers are also expected to move toward self-manufacturing of certain carbonated soft drink packages where cost effective.

#### 3. INCREASES IN THE DEBTORS' NET LOSSES, HIGH LEVERAGE AND LIQUIDITY CONSTRAINTS HAVE REDUCED THEIR ROOM TO MANEUVER

As a result of the circumstances discussed above, Constar incurred net losses of $10.3 million for the 2006 fiscal year and net losses of $26.3 million for the 2007 fiscal year. Continuing net losses have limited its ability to service debt and to fund operations. Net cash provided by operating activities decreased from $44.3 million in 2006 to $10.3 million in 2007. Servicing outstanding indebtedness requires annual payments of $37.3 million of interest. While additional borrowings under the ABR Facility may alleviate short-term cash needs, any such borrowings will only increase Constar's debt. Considering Constar's performance in 2006 and 2007, refinancing current debt is likely impossible to accomplish on commercially reasonably terms and may not be possible at all.

---

[9] As described infra, borrowings under the ABR facility are tied to receivables generated in the US and Europe.

Thus, the Debtors have become unable to support their current debt load.

## 4. DEBTORS BEGIN DEVELOPMENT OF PROPOSED PLAN

In light of the foregoing developments, Constar and its representatives began discussions with certain holders of its Senior Subordinated Notes during October 2008 with respect to possible restructuring alternatives. These discussions led to the formation of an ad hoc committee of holders of the Senior Subordinated Notes (the "Ad Hoc Committee"). Upon information and belief, the members of the Ad Hoc Committee hold, in the aggregate, over 50% of the principal face amount of the Senior Subordinated Notes. The Ad Hoc Committee has retained Goodwin Procter LLP as its counsel.

The first meeting between Constar (or its representatives) and the Ad Hoc Committee (or its representatives) occurred on October 27, 2008. At that meeting and in subsequent discussions, the parties discussed the conversion of the Senior Subordinated Notes into new equity of Constar. Such a transaction would be highly beneficial to the Debtors as it would significantly de-lever Constar's balance sheet and materially reduce its annual debt service obligations.

On or about December 15, 2008, Constar and a majority of the holders of the Senior Subordinated Notes reached an agreement in principle on the terms of a framework for a restructuring whereby Constar and certain of its subsidiaries would file chapter 11 petitions and, simultaneously, a pre-arranged plan of reorganization (a) providing for the conversion of the Senior Subordinated Notes into all of the equity of the reorganized entities, excluding those shares reserved for Constar's management, while (b) leaving the Debtors' trade vendors and the holders of the Senior Secured FRNs unimpaired. While the constituents of the Ad Hoc Committee are not legally bound to support the restructuring plan, the conversion of the Senior Subordinated Notes into equity, the payment of trade vendors in full and the reinstatement of the Senior Secured FRNs has the support of the holders of more than 50 percent of the outstanding Senior Secured Notes.

## B. EVENTS OF THE CHAPTER 11 CASES

In order to facilitate the Chapter 11 Cases and minimize disruption to the Company's operations, the Debtors have sought or will seek certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Cases, however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

## 1. Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. As noted above, the Debtors have been in extensive negotiations with the Senior Subordinated Noteholders to complete an exchange offer that will deleverage their balance sheet and complete a financial restructuring.

No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors. On the Petition Date, the Debtors promptly requested that the Bankruptcy Court set a hearing date to approve this Disclosure Statement and to confirm the Plan. The Bankruptcy Court has set _____, 2009 as the hearing date to approve this Disclosure Statement and _____, 2009 as the date to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be approximately ten (10) days after the date the Bankruptcy Court enters the Confirmation Order. Should these projected timelines prove accurate, the Debtors could emerge from chapter 11 within sixty to ninety days of the Petition Date.

## 2. First Day Relief

On the Petition Date, the Debtors presented certain motions (the "First Day Motions") to the Bankruptcy Court seeking relief. The First Day Motions include, but are not necessarily limited to, the following:

(a)     Approval of Solicitation Procedures and Scheduling of Confirmation Hearing

To expedite the Chapter 11 Cases, the Debtors sought an immediate order setting dates for hearings to (i) approve solicitation procedures and the Disclosure Statement; and (ii) confirm the Plan.

(b)     Debtor in Possession Financing

The Debtors expect to receive debtor in possession financing from a syndicate of Lenders including affiliates of Citigroup Global Markets Inc. and Wells Fargo Foothill, LLC, with Citicorp USA, Inc. as Administrative Agent, to enter into the DIP Facility with a total commitment of $75 million. On the Petition Date, the Debtors sought interim authority to make immediate borrowings under the DIP Facility and will seek final authority to with respect to the DIP Facility as soon as practicable thereafter. The Debtors believe that the committed amount of the DIP Facility will meet the Debtors' financing needs during the Chapter 11 Cases' brief duration.

(c)     Customer Programs and Practices

On the Petition Date, the Debtors sought an order authorizing, but not directing, the Debtors to honor certain prepetition obligations to their customers and to otherwise continue certain customer programs and practices in the ordinary course of business. Under this motion, the Debtors intend to obtain authority to honor, exercise, and perform all their respective rights and obligations (whether prepetition or postpetition) arising in the ordinary course of business under, in connection with, and in furtherance of their existing customer agreements. The Debtors believe such relief is necessary to stabilize their customer base at the outset of these Chapter 11 Cases and to avoid needless disruptions of the Debtors' ongoing operations.

(d)     Critical Suppliers and Warehousemen

On the Petition Date, the Debtors sought an order authorizing, but not directing, the Debtors to pay certain prepetition expenses and directing banks and financial institutions to honor related checks and payment requests. Under this motion, the Debtors intend to obtain authority to satisfy outstanding obligations, if any, to a limited number of critical suppliers and warehousemen that provide the Debtors with critical services on a frequent, if not daily, basis. The Debtors believe that payment to these critical suppliers and warehousemen is necessary to avoid needless disruptions to the Debtors' business and to ensure the timely delivery of goods and services to their customers.

(e)     Existing Cash Management System and Investment Practices

On the Petition Date, the Debtors sought authority to maintain their prepetition cash management systems after commencement of the Chapter 11 Cases, including use of bank accounts and business forms and authority for the Debtors to continues their existing investment practices. This facilitates the efficient operation of the Debtors by not requiring them to make artificial adjustments within their large and complex cash management system.

(f)     Wages and Benefits

On the Petition Date, the Debtors sought authority to pay all employees their wages in the ordinary course of business. Additionally, the Debtors sought authority to continue all their prepetition benefit programs, including, among others, the medical, dental, 401(k), and severance plans. This relief will allow the Debtors to maintain employee morale and prevent costly distractions and retention issues.

(g)     Sales, Use and Franchise Tax

On the Petition Date, the Debtors sought authority to pay certain sales, use, and other governmental taxes as well as fees, license and other similar charges and assessments in the ordinary course of business. Some, if not all, of the taxing authorities may cause the Debtors to be audited if taxes are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from their reorganization efforts. Thus, in order to prevent costly distractions, the Debtors are seeking authority to pay those taxes in the ordinary course of business.

(h)     Equity Trading Restrictions

On the Petition Date, the Debtors filed a motion requesting entry of an order establishing notification and hearing procedures that must be satisfied before certain transfers of Constar International Inc.'s equity securities are deemed effective.

(i)     Insurance

The Debtors maintain a variety of insurance policies, including general liability, automotive liability, worker's compensation, directors and officers liability, and other policies. On the Petition Date, in order to avoid any potential lapse of coverage and the expense of acquiring new coverage, and to continue prepetition premium financing arrangements, the Debtors sought authority to pay all prepetition premiums in the ordinary course of business.

(j)     Utilities

On the Petition Date, the Debtors filed a motion seeking approval of procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Debtors are not required to provide any additional adequate assurance pending entry of a Final Order. The Debtors believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization.

(k)     Interim Compensation Procedures

On the Petition Date, the Debtors sought authority to establish procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases. The Debtors believe that the efficient administration of the Chapter 11 Cases will be significantly aided by establishing the interim compensation and expense reimbursement procedures.

(l)     Ordinary Course Professionals

On the Petition Date, the Debtors sought authority to retain and compensate certain Professionals utilized in the ordinary course of the Debtors' business (each, an "OCP"). Due to the number of OCPs that are regularly retained by the Debtors, it would be unwieldy and burdensome to both the Debtors and this Court to request each such OCP to apply separately for approval of its employment and compensation.

(m)     Other Procedural Motions and Professional Retention Applications

On the Petition Date, the Debtors filed several procedural motions that are standard in Chapter 11 Cases, as well as applications to retain the various Professionals who will be assisting the Debtors during these Chapter 11 Cases.

## IV. **THE JOINT PLAN**

### A.    **INTRODUCTION**

The summary of the Plan contained herein is qualified in its entirety by reference to the Plan and the exhibits to this Disclosure Statement and the Plan. It is the Plan and orders entered by the Bankruptcy Court and not this Disclosure Statement that govern the rights and obligations of the parties.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## B. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1. DIP Facility Claims

This category of claims consists of all claims against any of the Debtors arising under or related to the DIP Credit Agreement. Subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the DIP Facility shall, at the option of the Debtors, either be repaid in Cash in full on the Effective Date or, subject to satisfaction of certain conditions, be converted into the Exit Facility. Alternatively, in lieu of converting the DIP Facility into the Exit Facility, the Debtors may enter into an Alternative Exit Facility, in which event the DIP Facility Claims shall be paid in full by the Alternative Exit Facility.

### 2. Administrative Claims

This category of claims consists of all claims against any of the Debtors for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code. Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of such Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of such Allowed Administrative Claim in accordance with the terms of the applicable contract or agreement governing such Claim, if any.

### 3. Priority Tax Claims

This category consists of claims against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be paid in full in Cash pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

## C. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The Plan provides for the classification and treatment of seven Classes of Claims and Interests (treating the Debtors as a single entity). A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Each class contains six separate subclasses – one each for each of the entities that are Debtors in these proceedings.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Senior Secured FRN Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Senior Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.**     **TREATMENT OF CLAIMS AND INTERESTS**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

**1.**     **Class 1 – Other Priority Claims**

Class 1 – Other Priority Claims consists of all priority claims against any of the Debtors other than Administrative Claims and Priority Tax Claims. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash.

**2.**     **Class 2 – Senior Secured FRN Claims**

Class 2 – Senior Secured FRN Claims consists of all claims against any of the Debtors arising under or in connection with the Senior Secured FRNs, other than a Section 510(b) Claim. For purposes of the Plan, all Senior Secured FRN Claims shall be Allowed in full and such allowed claims will be satisfied by being Reinstated in full.

**3.**     **Class 3 – Other Secured Claims**

Class 3 – Other Secured Claims consist of all Secured Claims against any of the Debtors that are not DIP Facility Claims, Existing Facility Claims or Senior Secured FRN Claims. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the Debtors or the Reorganized Debtors, as applicable: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claim in full in Cash; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim and pay any interest required to be paid under section 506(b) of the Bankruptcy Code; (iii) the Debtors or the Reorganized Debtors shall Reinstate any Allowed Other Secured Claim in full; or (iv) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired.

**4.**     **Class 4 – Senior Subordinated Note Claims**

Class 4 – Senior Subordinated Note Claims consists of all claims against any of the Debtors arising under or in connection with the Senior Subordinated Notes, other than a Section 510(b) Claim. In full and final satisfaction, settlement, release, and discharge of and in exchange for the Senior Subordinated Notes, each Holder of an Allowed Senior Subordinated Note Claim shall receive his Pro Rata portion of the Distribution Shares. Holders that beneficially own a majority of the Senior Subordinated Note holders are supportive of the Plan.

**5.**     **Class 5 – Other General Unsecured Claims**

Class 5 –Other General Unsecured Claims consists of all unsecured claims against any of the Debtors other than Class 4 – Senior Subordinated Note Claims and Class 6 – Section 510(b) Claims. Allowed Other General Unsecured Claims will be Reinstated in full and/or paid in the ordinary course of the Reorganized Debtors' business.

6. **Class 6 – Section 510(b) Claims**

Class 6 –Section 510(b) Claims consists of all claims against any of the Debtors arising from rescission of a purchase or sale of a security of Constar or any of its affiliates, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim. On the Effective Date, all Class 6 – Section 510(b) Claims shall be extinguished and no distributions shall be made on account of Class 6 Claims. For the avoidance of doubt, any Claim arising out of that certain class consolidated securities class action lawsuit filed in the United States District Court for the Eastern District of Pennsylvania, In re Constar International Inc. Securities Litigation (Master File No. 03-CV-05020), is considered a Class 6 Section 510(b) Claim.

7. **Class 7 - Equity Interests**

Class 7 –Equity Interests consist of (a) any equity security in a Debtor, including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company, or similar interest in a Debtor; provided, however, that Class 7 - Equity Interests does not include any equity security in a Debtor held by another Debtor or any equity security in a Debtor held by an Affiliate of a Debtor. On the Effective Date, all Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Class 7 Equity Interests.

E. **SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

F. **ACCEPTANCE OR REJECTION OF THE PLAN**

Class 4 is Impaired under the Plan and is the sole class entitled to vote to accept or reject the Plan. Classes 1, 2, 3, and 5 are Unimpaired under the Plan, are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes 6 and 7 are Impaired and shall receive no distribution under the Plan. The Holders of Claims and Interests in Classes 6 and 7 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

G. **MEANS FOR IMPLEMENTATION OF THE PLAN**

1. **Treatment of Executory Contacts and Unexpired Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed as of the Effective Date each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Confirmation Date; or (4) is set forth in a schedule, as an Executory Contract or Unexpired Lease to be rejected, filed as part of the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above as of the Effective Date. Notwithstanding the foregoing paragraph, after the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any intercompany contracts, leases, or other agreements without approval of the Bankruptcy Court.

2. **Issuance of New Equity**

The issuance of the New Equity, including the Distribution Shares and the shares of the New Equity, options, or other equity awards, if any, reserved for the Management Incentive Plan, by Reorganized Constar is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests. All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.

3. **Listing of New Equity**

The Reorganized Debtors shall, on or as soon as reasonably practicable after the Effective Date, list the New Equity on a national securities exchange. The Reorganized Debtors shall apply for termination of registration of the Old Common Stock under the Exchange Act as soon as reasonably practicable after the Effective Date if the requirements for termination of registration are satisfied.

4. **Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

5. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the Exit Facility and Claims pursuant to the DIP Facility that by their terms survive termination of the DIP Facility). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6. **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, which such agreements or documents shall be acceptable to the Supporting Noteholders in their reasonable discretion; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, which such instruments shall be acceptable to the Supporting Noteholders in their reasonable discretion; (3) the filing of appropriate certificates of incorporation or consolidation with the appropriate governmental authorities pursuant to applicable law, which such certificates shall be acceptable to the Supporting Noteholders in their reasonable discretion; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate, subject to the consent of the Supporting Noteholders in their reasonable discretion.

## 7. Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity. Notwithstanding the preceding sentence, the members of the New Board shall be as set forth in the Plan Supplement or as otherwise determined by the Debtors (with the approval of the Supporting Noteholders in their exclusive discretion) and the New Board of Constar shall be approved by the members of the Existing Board.

## 8. Employee and Retiree Benefits

On and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that (a) the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan, and (b) the transactions contemplated under the Plan shall be deemed not to constitute a change of control for purposes of any of the foregoing. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding anything to the contrary in the Plan, upon the Effective Date, the Annual Incentive and Management Stock Purchase Plan, the Constar International Inc. 2007 Stock-Based Incentive Compensation Plan and the Constar International Inc. 2002 Stock-Based Incentive Compensation Plan, and any and all related agreements, documents or instruments shall be terminated.

## 9. D&O Tail Coverage Policies

On the Effective Date, the Debtors shall assume the D&O Liability Insurance Policies, which provide tail coverage to the Debtors' officers and directors. In addition, as of the Effective Date, the Debtors shall either assume such other directors and officers liability insurance policies (if procured prior thereto), or enter into such other new directors and officers liability policies as the Debtors shall determine, in each case as acceptable to the Supporting Noteholders in their sole discretion. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

## 10. Sources of Consideration for Plan Distributions

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Exit Facility, the issuance of the New Equity or other Cash from the Debtors, including Cash from operations.

## 11. Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan]. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Debtors expressly waive their right to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action relating to a preference payment made before the filing of this case.

## H. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Timing and Calculation Of Amounts To Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2. Disbursing Agent

All distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Notwithstanding the foregoing paragraph, distributions of New Equity to the Holders of Senior Subordinated Note Claims shall be made by the Reorganized Debtors to the Senior Subordinated Note Trustee for the Pro Rata benefit of the Holders of Senior Subordinated Note Claims. All distributions by the Senior Subordinated Trustee shall be at the discretion of the Reorganized Debtors, and the Senior Subordinated Note Trustee shall not have any liability to any person or Entity for distributions made by it under the Plan.

### 3. Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 4. Distributions on Account of Claims Allowed After the Effective Date

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed.

### 5. Minimum Distributions

The Reorganized Debtors shall not be required to make partial distributions or payments of fractions of shares of New Equity and such fractions of shares shall be deemed to be zero.

### 6. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

## I. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### 1. Procedures Regarding Disputed Claims

Except as otherwise provided in the Plan or by other order of the Bankruptcy Court, Holders of Claims shall be required to File proofs of claim by the bar date established by the Debtors' First Day Pleadings (the "Bar Date"). After the Bar Date, the Debtors and the Reorganized Debtors, as applicable, will review all the Claims, and reserve the right to object to any Claim that is entitled, or deemed to be entitled, to a distribution under the Plan or is rendered Unimpaired under the Plan. The Debtors intend to make distributions, as required by the Plan, in accordance with the books and records of the Debtors. Unless disputed by a Holder of a Claim, the amount set forth in the books and records of the Debtors shall constitute the amount of the Allowed Claim of such Holder. If any such Holder of a Claim disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Claim, such Holder must so advise the Debtors in writing, within thirty (30) days of the filing of the schedules of Allowed Claims, in which event the Claim will become a Disputed Claim. The Debtors intend to

attempt to resolve any such disputes consensually or through judicial means outside the Bankruptcy Court. Nevertheless, the Debtors may, in their discretion, file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or any other appropriate motion or adversary proceeding with respect thereto. All such objections will be litigated to Final Order; provided, however, that the Debtors may compromise, settle, withdraw, or resolve by any other method approved by the Bankruptcy Court any objections to Claims.

2.      **Allowance of Claims and Interests**

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

3.      **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

4.      **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

5.      **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim, or a Class of Claims, are Impaired Classes under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy before the Effective Date.

J.   **SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

1.      **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon

such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof. The actions of the Securities and Exchange Commission that (1) are non-pecuniary, (2) do not relate to collection of a Claim, or (3) do not pursue injunctions that could be reduced to a monetary Claim, are not discharged under Article VIII.A. of the Plan.

2.      **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, and including, but not limited to, the Section 510(b) Claims, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

3.      **Compromise and Settlement of Claims and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

4.      **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.**

5. Exculpation

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof. Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers.

6. Releases by Holders of Claims and Interests

Except as otherwise specifically provided in the Plan or Plan Supplement, on and after the Effective Date, Holders of Claims and Interests voting to accept the Plan (which by definition, does not include Holders of Claims and Interests who (i) vote to reject the Plan, (ii) are not entitled to vote to accept or reject the Plan, (iii) abstain (do not vote to accept or reject the Plan), or (iv) whose vote of yes or no is illegible and therefore deemed an affirmative vote), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

7. Injunction

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.D or Article VIII.F of the Plan, discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtors: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property

or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity will: (1) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

8.  **Setoffs**

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may setoff against any Allowed Claim (other than a DIP Facility Claim) or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); _provided_, _however_, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

9.  **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10. **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## K.   ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court. Professionals shall be paid pursuant to the Interim Compensation Order.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## L.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.   Conditions Precedent to Confirmation

Unless waived, the following are conditions precedent to Confirmation of the Plan: (i) the Bankruptcy Court or any other court of competent jurisdiction shall not have dismissed or abstained from hearing any of the Chapter 11 Cases; (ii) the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Supporting Noteholders in their sole discretion on or before 75 days following the Petition Date; (iii) the most current version of the Plan Supplement (and any amended or revised Plan Supplements and/or additional Plan Supplements filed prior to the Effective Date), all of the schedules, documents, and exhibits contained therein, and any and all plan-related documents, agreements or instruments shall have been Filed in form and substance acceptable to the Supporting Noteholders in their sole discretion; (iv) either (a) the Debtors have determined to convert the DIP Credit Facility into the Exit Facility, and all conditions to such conversion (other than conditions that are not capable of being satisfied until the Effective Date) set forth in the DIP Credit Agreement have been satisfied (or waived by the requisite DIP Lenders under the DIP Credit Agreement in their sole discretion), or (b) the Debtors have entered into the Alternative Exit Facility Credit Agreement and all conditions to the closing of such agreement (other than conditions that are not capable of being satisfied until the Effective Date) set forth therein have been satisfied or waivedc; (v) the amount of Allowed Claims in Class 5 against the Debtors and the amount of Disputed Claims in Class 5 against the Debtors that the Debtors estimate in good faith, and as agreed to by the Supporting Noteholders in their reasonable discretion, will ultimately be Allowed as of the Confirmation Date, shall not aggregate more than $_____; and (vi) the Plan Supplement(s), all of the schedules, documents, and exhibits contained therein, and any and all plan-related documents, agreements or instruments shall have been Filed in form and substance acceptable to the Supporting Noteholders in their sole discretion without prejudice to the Reorganized Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement.

### 2.   Conditions Precedent to Consummation

Unless waived, the following are conditions precedent to Consummation of the Plan: (i) the Old Employee Agreements and the SERP shall have been modified to waive any change of control provisions and the transactions contemplated under the Plan shall not be deemed a change of control pursuant to any change of control provisions in any other material agreements of the Debtors and/or its Affiliates, and any amendments or modifications to any of the foregoing plan or agreements shall be in form and substance acceptable to the Supporting Noteholders in their sole discretion; (ii) the Confirmation Order shall have been entered in a form and in substance acceptable to the Supporting Noteholders in their sole discretion; (iii) the Confirmation Order shall provide that the transactions contemplated under the Plan shall not be deemed a change of control pursuant to any change of control provisions in the Senior Secured FRN Indenture; (iv) funding pursuant to the Exit Facility shall have occurred or shall occur simultaneously with Consummation and, in the event there is not a Conversion Date, the DIP Credit Facility shall have been repaid in full and terminated; (v) in the event that there have been any changes to the Plan Supplement(s) after the Confirmation Date, such changes shall have been Filed in form and substance acceptable to the Supporting Noteholders in their sole discretion without prejudice to the Reorganized Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; (vi) the Effective Date shall have occurred on or before the date that is 20 days from the date upon which the order is entered confirming the Plan; and (vii) all actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

## M.  GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

## N.  REVOCATION, WITHDRAWAL, MODIFICATION OR AMENDMENT OF THE PLAN

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests by or against the Debtors or any other party in interest; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

Except as otherwise specifically provided in the Plan, the Debtors also reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code, provided, however, that any such modifications shall be in form and substance acceptable to the Supporting Noteholders in their sole discretion. Each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, subject to (i) certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and (ii) any such alteration, amendment or modification being acceptable to the Supporting Noteholders in their sole discretion. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan. For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

## V.  RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection, of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 of the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement (other than the Exit Facility Agreement and any documents related thereto);

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (other than the Exit Facility Agreement and any documents related thereto);

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## VI. SOLICITATION AND VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### A.     THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- the appropriate Ballots and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

The Core Group and the single voting Class (Class 4) entitled to vote to accept or reject the Plan shall be served paper copies and a CD-ROM containing the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan. Parties who wish to receive additional copies of these documents may request a copy from the Voting Agent by writing to Epiq Bankruptcy Solutions, LLC, c/o Constar Ballot Processing, 757 Third Avenue, Third Floor, New York, NY 10017, or calling (646) 282-2500. The Solicitation Package (except the Ballots) can also be obtained by any party by accessing the Voting Agent's web site at http://chapter11.epiqsystems.com.

The Plan Supplement will be Filed no later than fourteen days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court. The Plan Supplement will include the following: (a) the terms of the Exit Facility, (b) new organizational documents; (c) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under the Bankruptcy Code; (d) a list of Executory Contracts and Unexpired Leases to be rejected]; (e) [the Stockholders Agreement and all documents and instruments relating thereto; (f) a list of retained Causes of Action; (g) the Management Incentive Plan; and (h) the Exit Financing Commitment Letters.