The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq Bankruptcy Solutions, LLC as their claims and noticing agent and as their voting agent (the "Voting Agent") to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File the Voting Report as soon as practicable before the Confirmation Hearing.

Holders of Class 4 Claims are required to send an original signed copy of the Ballot by U.S. first class mail or overnight delivery to the address set forth in the pre-addressed envelope provided with the Solicitation Package. For purposes of determining compliance with the Voting Deadline, the relevant time is the time at which the Ballot is **actually received** by the Voting Agent. The Voting Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") as soon as practicable before the Confirmation Hearing.

All Ballots must be sent by the record holders of the Class 4 Claims to the Voting Agent at the following address:[10]

VIA U.S. MAIL OR OVERNIGHT DELIVERY
Epiq Bankruptcy Solutions, LLC
c/o Constar Ballot Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

All votes to accept or reject the Plan must be cast by using a Ballot. Votes which are cast in any manner other than by using a Ballot will not be counted.

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF THEIR CLAIMS TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASS 4 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, THEN ANY SUCH EARLIER BALLOTS ARE REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

For all Holders of Claims in Class 4:

By signing and returning a Ballot, each Holder of a Claim in Class 4 will be certifying to the Bankruptcy Court and the Debtors that, among other things,

- the Holder has received and reviewed a copy of the Second Amended Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims in a single Class;

---

[10] Beneficial holders of Class 4 Claims who are not also the record holders of such claims will be required to return their Ballots to their nominees at the address provided on the return envelope sufficiently in advance of the Voting Deadline so that it can be returned by the nominees to the Debtors' Voting Agent by the Voting Deadline.

- no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked; and

- the Holder consents to all relief requested in the First Day Motions.

## C.   VOTING TABULATION

To ensure that a vote is counted, the Holder of a Claim should: (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Second Amended Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed prepaid envelope by the Voting Deadline.

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim. Only Holders of Claims in the single voting Class shall be entitled to vote with regard to such Claims.

Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to the Voting Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot. Delivery of a Ballot to the Voting Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Voting Agent), or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Second Amended Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Second Amended Plan regarding modifications). The Bankruptcy Code requires the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Second Amended Plan or if the Debtors waive a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Second Amended Plan cast with respect to that Claim will be counted for purposes of determining whether the Second Amended Plan has been accepted and/or rejected.

Neither the Debtors nor any other person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

As soon as practicable after the Voting Deadline, the Debtors will File the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or are damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.

## D.   VOTES SOLICITED IN GOOD FAITH

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Second Amended Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good

-28-

faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Second Amended Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Second Amended Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Second Amended Plan.

## VII.  VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.  VALUATION OF THE REORGANIZED DEBTORS.

At the Debtors' request, Greenhill & Co., LLC ("Greenhill") has prepared an estimated post-Confirmation going concern value for the Reorganized Debtors.

In preparing the estimated Reorganized Debtors' enterprise value, Greenhill: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the financial projections developed by Debtors' management relating to their businesses and prospects (the "Financial Projections"); (c) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) reviewed the Financial Projections as prepared by the Debtors; (e) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (f) considered certain economic and industry information relevant to the Debtors' operating businesses; (g) visited certain of the Debtors' facilities; and (h) reviewed certain analyses prepared by other firms retained by the Debtors and conducted such other analyses as Greenhill deemed appropriate.

Although Greenhill conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Greenhill assumed and relied on, without independent verification, the accuracy and completeness of all: (a) financial and other information furnished to it by or on behalf of the Debtors, including the Financial Projections and (b) publicly available information. Greenhill assumed that the Financial Projections were prepared reasonably and in good faith on a basis reflecting the Debtors' best estimates and judgment as to future operating and financial performance. Greenhill did not conduct an independent evaluation or appraisal of the Debtors' assets, and no independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

Greenhill estimated the Reorganized Debtors' enterprise value to be between approximately $260 million and $300 million, with a midpoint of $280 million as of an assumed effective date of March 31, 2009.[11]  This reorganization enterprise value (ascribed as of the date of this Disclosure Statement) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty today as to the achievement of the Debtors' Financial Projections, which are set forth below in "Financial Projections." Additionally, Greenhill did not prepare a separate valuation of any potential tax benefits resulting from the use of existing net operating losses ("NOLs") as the future balance, timing and utilization (including according to Section 382 of the IRS Code) is currently unclear. Therefore, while there may be future value realized as a result of the NOLs, for purposes of estimating the Reorganized Debtors' enterprise value, any such value was excluded.  Greenhill's estimate of a range of enterprise values does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the terms of the Second Amended Plan or of the terms and conditions of the Second Amended Plan.

The range of the estimated Reorganized Debtors' enterprise value, as of an assumed effective date of March 31, 2009, reflects work performed by Greenhill on the basis of information available to, and analyses undertaken by, Greenhill as of January 26, 2009.  It should be understood that, although subsequent developments may affect Greenhill's conclusions, Greenhill does not have any obligation to update, revise, or reaffirm its estimate.

In performing its analysis, Greenhill used various valuation techniques, including: (a) a comparable company analysis, in which Greenhill analyzed the enterprise values of public companies that Greenhill deemed

---

[11]  This is not the Effective Date as defined in the Plan.

generally comparable to all or parts of the Debtors' operating business as a multiple of certain financial measures, including earnings before interest, taxes, depreciation and amortization ("EBITDA") and then applied selected multiples derived from such analysis to the actual and projected EBITDA of the Debtors; (b) a precedent transactions analysis, in which Greenhill analyzed the financial terms of certain acquisitions of companies that Greenhill believed were comparable to all or parts of the Debtors' operating business, and then applied certain financial performance and other metrics provided by such analysis to the relevant metrics of the Debtors; and (c) a discounted cash flow analysis, in which Greenhill, using a weighted average cost of capital, computed the present value of free cash flows from the Debtors and the terminal value of the Debtors.

The summary set forth above does not purport to be a complete description of the analyses performed by Greenhill. An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect the value of an operating business. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of implied reorganized equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties and contingencies beyond the control of the Debtors and the Reorganized Debtors, neither the Debtors, the Reorganized Debtors, Greenhill, nor any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, Greenhill's valuation analysis as of the Effective Date may differ from that disclosed herein. In addition, estimates of implied reorganized equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold.

The foregoing valuation reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the amount of available cash, market conditions, the availability of certain tax attributes and the Second Amended Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. The estimates of value represent hypothetical enterprise values of the Reorganized Debtors as the continuing operator of its business and assets and assume that such assets are operated in accordance with the Debtors' business plan. They do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the trading value or sale of any securities to be issued pursuant to the Second Amended Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Second Amended Plan and analysis of implied relative recoveries to creditors thereunder. Moreover, to the extent that the estimated range of enterprise value is dependent upon the Debtors' achievement of the Financial Projections, it is inherently speculative.

In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by these Chapter 11 Cases or by other factors not possible to predict. Accordingly, the reorganization enterprise value estimated by Greenhill does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The enterprise value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value. Such trading value may be materially different from the reorganization enterprise value ranges associated with Greenhill's valuation analysis. Indeed, there can be no assurance that a trading market will develop for the New Equity.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE SECOND AMENDED PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED CALCULATION OF ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE DEBTORS' FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL, AS FURTHER DISCUSSED IN THE RISK FACTORS AND ELSEWHERE IN THE DISCLOSURE STATEMENT.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE ENTERPRISE VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED ENTERPRISE VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN BY GREENHILL FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATIONS ARE ASSUMED TO REVISE THIS CALCULATION OF THE DEBTORS' OR THE REORGANIZED DEBTORS' VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

## B.    FINANCIAL PROJECTIONS

In connection with developing the Second Amended Plan, and to assist each Holder of a Claim in determining whether to accept or reject the Second Amended Plan, the Debtors have developed a set of financial projections which are set forth in Exhibit C attached hereto.

The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

The estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections. No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors consider the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**THE DEBTORS DID NOT PREPARE THE FINANCIAL PROJECTIONS WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT AUDITOR HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.**

**FINANCIALS PRESENTED FOR THE PERIOD ENDING DECEMBER 31, 2008 ARE UNAUDITED, ARE PRELIMINARY AND ARE SUBJECT TO CHANGE.**

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW EQUITY OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

**THE DEBTORS PERIODICALLY ISSUE PRESS RELEASES REPORTING FINANCIAL RESULTS AND HOLDERS OF CLAIMS ARE URGED TO REVIEW ANY SUCH PRESS RELEASES WHEN, AND AS, ISSUED.**

### 1.    Significant Assumptions

The Debtors prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors.

Although the forecasts represent the best estimates of the Debtors, for which the Debtors believe they have a reasonable basis as of the date hereof, of the results of operations and financial position of the Debtors after giving effect to the reorganization contemplated under the Second Amended Plan, they are only estimates and actual results may vary considerably from forecasts. Consequently, the inclusion of the forecast information herein should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the forecast results will be achieved.

The Financial Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Second Amended Plan. The Financial Projections should be read in conjunction with Article X herein "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE SECOND AMENDED PLAN" for a discussion of the risks related to the Second Amended Plan.

The Financial Projections assume an effective date of March 31, 2009, and as required, the concepts of Fresh Start Accounting will be applied for periods after the effective date. These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code." Adoption of Fresh Start Accounting requires the determination of the reorganization value of the entity that emerges from bankruptcy. Reorganization value generally approximates fair value of the entity before considering liabilities. An enterprise valuation analysis was completed by Greenhill which estimated a reorganization value range between $260 million and $300 million with a midpoint of $280 million.

The process of fair valuing assets as part of fresh start accounting may result in changes to the carrying value of assets and liabilities, including property, plant, and equipment or may result in the creation of new intangibles for such items as customer contracts. The current Financial Projections assume no such differences. The Company is in the process of selecting a third party appraisal firm to assist in determining these values.

## VIII.  CONFIRMATION PROCEDURES

### A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Second Amended Plan. The Debtors have sought an order of the Bankruptcy Court scheduling

a hearing to consider the approval of the solicitation procedures, including this Second Amended Disclosure Statement and confirmation of the Second Amended Plan. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available at the web site of Epiq Bankruptcy Solutions, LLC, the Debtors' Notice and Claims Agent, http://chapter11.epiqsystems.com/constar. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**B.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE SECOND AMENDED PLAN**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court shall enter the Confirmation Order. The Debtors believe that the Second Amended Plan satisfies or will satisfy the applicable requirements, as follows:

- The Second Amended Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Second Amended Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Second Amended Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Second Amended Plan for services or for costs and expenses in, or in connection with, the chapter 11 Cases, or in connection with the Second Amended Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Second Amended Plan is reasonable; or (b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Second Amended Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Second Amended Plan, or will receive or retain under the Second Amended Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Second Amended Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Equity Interests that is entitled to vote on the Second Amended Plan has either accepted the Second Amended Plan or is not Impaired under the Second Amended Plan, or the Second Amended Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Second Amended Plan provides that Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims or Equity Interests will accept the Second Amended Plan, determined without including any acceptance of the Second Amended Plan by any insider holding a Claim of that Class.

- Confirmation of the Second Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Second Amended Plan unless such a liquidation or reorganization is proposed in the Second Amended Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

US1DOCS 6890484v16

The Debtors believe that: (a) the Second Amended Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) they have complied or will have complied with all of the requirements of chapter 11; and (c) the Second Amended Plan has been proposed in good faith.

*Best Interests of Creditors Test/Liquidation Analysis*

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Second Amended Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Second Amended Plan, or will receive or retain under the Second Amended Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Debtors' Chapter 11 Cases were converted to liquidation cases under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the Debtors' assets into Cash. The Debtors' "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Debtors at the time of the conversion to chapter 7 cases, and the proceeds resulting from the chapter 7 trustee's sale of the Debtors' remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtors (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Second Amended Plan. It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Second Amended Plan. In a hypothetical chapter 7 liquidation of the Debtors' assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full. Therefore, in a hypothetical chapter 7 liquidation, the Debtors' available assets generally would be distributed to creditors and Interest Holders in the following order: DIP Facility Claims; Senior Secured FRN Claims; Other Secured Claims; Administrative Claims; Other Priority Claims; Senior Subordinated Note Claims; Other General Unsecured Claims; Section 510(b) Claims; and Equity Interests.

Of the foregoing groups of Claims, the DIP Facility Claims, Other Secured Claims, Administrative Claims, Other Priority Claims, Senior Secured FRN Claims; Other General Unsecured Claims are either unclassified or "Unimpaired" under the Second Amended Plan, meaning that the Second Amended Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims are deemed to accept the Second Amended Plan. Senior Subordinated Note Claims are "Impaired" under the Second Amended Plan and are entitled to vote on the Second Amended Plan. The remainder of the Classes of Claims and Interests are to receive no distribution under the Second Amended Plan and therefore are deemed to reject the Second Amended Plan. Because the Bankruptcy Code requires that impaired creditors either accept the Second Amended Plan or receive at least as much under the Second Amended Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Second Amended Plan is whether in a chapter 7 liquidation, after accounting for recoveries by Secured, Administrative, and Priority creditors, the impaired creditors and interest holders will receive more or less than under the Second Amended Plan. If the probable distribution to impaired creditors and interest holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Second Amended Plan, then the Second Amended Plan is not in the best interests of impaired creditors and interest holders.

As described in more detail in the liquidation analysis set forth in Exhibit B hereto (the "Liquidation Analysis"), the Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Second Amended Plan. In particular, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. .

*Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Second Amended Plan. The Second Amended Plan contemplates a Second Amended Plan in which virtually all creditors will be paid in full, and the Debtors' balance sheet will become materially deleveraged. In addition, the Debtors have already secured a commitment for an Exit Facility (as defined below), and therefore sufficient funds will exist to make all payments required by the Second Amended Plan. For these reasons, the Debtors believe that the Second Amended Plan meets the financial feasibility requirement.

*Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims or Equity Interests that is impaired under the Second Amended Plan accept the Second Amended Plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of that claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the equity interest holder is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two-thirds in amount actually voting have voted to accept the plan.

The Claims and Interests in Classes 1, 2, 3, and 5 are not Impaired under the Second Amended Plan, and as a result the Holders of such Claims are deemed to have accepted the Second Amended Plan.

Claims in Class 4 are Impaired under the Second Amended Plan. The single voting Class (Class 4) will have accepted the Second Amended Plan if the Second Amended Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Second Amended Plan.

The members of Classes 6 and 7 will not receive a distribution under the Second Amended Plan, are deemed to reject the Second Amended Plan, and are not entitled to vote on the Second Amended Plan.

*Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, *provided that* the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan

-35-

discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes. Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors believe that the separation of the Senior Subordinated Note Claims from the Other General Unsecured Claims into two Classes has a reasonable basis in fact, and, therefore, the classification scheme in the Second Amended Plan does not unfairly discriminate.

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by Debtors or transferred to another entity under the plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non-accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a) no Class of Equity Interests junior to the non accepting Class may receive a distribution under the plan.

The Second Amended Plan provides that if any Impaired Class rejects the Second Amended Plan, the Debtors reserve the right to seek to confirm the Second Amended Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Second Amended Plan or is deemed to have rejected the Second Amended Plan, the Debtors will request Confirmation of the Second Amended Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Second Amended Plan or any exhibit or schedule to the Second Amended Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The Debtors submit that if the Debtors "cram down" the Second Amended Plan pursuant to section 1129(b) of the Bankruptcy Code, the Second Amended Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

C.    **RISK FACTORS**

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article X hereof, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Second Amended Plan."

US1DOCS 6890484v16

D.    **IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION**

Any interested party desiring further information about the Second Amended Plan should contact: Counsel for the Debtors: Andrew N. Goldman, Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue, New York, New York 10022, via e-mail at andrew.goldman@wilmerhale.com or by phone at (212) 230-8836.

E.    **DISCLAIMER**

In formulating the Second Amended Plan, the Debtors have relied on financial data derived from books and records. The Debtors therefore represent that everything stated in the Second Amended Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Second Amended Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Second Amended Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Second Amended Plan.

The discussion in the Second Amended Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

NOTHING CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.

ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS SECOND AMENDED DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE SECOND AMENDED DISCLOSURE STATEMENT.

THE DEBTORS AND THEIR PROFESSIONALS ALSO HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS SECOND AMENDED DISCLOSURE STATEMENT PENDING LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS. HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THE SECOND AMENDED DISCLOSURE STATEMENT.

IX.    **IMPLEMENTATION OF THE SECOND AMENDED PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTORS**

A.    **BOARD OF DIRECTORS AND MANAGEMENT**

*Reorganized Debtors' Board of Directors*

On the Effective Date, the New Board of each of the Reorganized Debtors shall take office. The Debtors will disclose the identities of the individuals comprising the New Board of directors in an exhibit to the Plan Supplement. Each such director shall serve from and after the Effective Date pursuant to applicable law and the terms of the Reorganized Debtors' articles of incorporation in effect at such time, and the other constituent and organizational documents of the Reorganized Debtors. The Existing Board will be deemed to have resigned on and as of the Effective Date.

*The Reorganized Debtors' Officers*

The Debtors will disclose the identities of the individuals comprising the officers of the Reorganized Debtors in an exhibit to the Plan Supplement.

**B.     INDEMNIFICATION OF DIRECTORS AND OFFICERS**

The Reorganized Debtors' articles of incorporation or formation, as applicable, will authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors or managers and agents to the fullest extent permitted under the applicable state law.

**C.     MANAGEMENT INCENTIVE PLAN**

The Second Amended Plan provides that equity awards (in the form of stock, options or warrants) of the New Equity may be granted to continuing employees of the Debtors by the New Board of directors of the Reorganized Debtors, under the terms of a Management Incentive Plan which shall be in form and substance acceptable to the Supporting Noteholders in their sole discretion, as set forth in a Plan Supplement. If granted, such equity awards shall be on terms reflective of a policy of rewarding the contribution of management to the long-term financial performance of the Reorganized Debtors.

**D.     EXIT FINANCING**

The Debtors and the Reorganized Debtors are authorized to execute and deliver all agreements, documents and instruments attached to the Exit Facility required to be executed and delivered in connection with the conversion of the DIP Facility into the Exit Facility or, if the Debtors elect not to convert the DIP Facility, to execute and deliver all agreements, documents and instruments required to be executed and delivered in connection with the Alternative Exit Facility and, in either event, to perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities (and, in the case of the Alternative Exit Facility, the repayment in full and termination of the DIP Credit Facility) without the need for further corporate action and without any further Bankruptcy Court approval. The Exit Facility Documents shall constitute the legal, valid and binding obligations of the Reorganized Debtors parties thereto, enforceable in accordance with their respective terms, the Liens granted to secure the DIP Credit Agreement shall continue to secure all obligations under the Exit Facility Documents (unless otherwise stated in the Exit Facility Documents) and shall not be altered, amended or discharged by confirmation of this Second Amended Plan and shall be, and shall remain, legal, valid, perfected, non-voidable and binding liens on, and security interests in, all property and assets of the Reorganized Debtors having the priority granted to them under the Second Amended Plan or the orders approving the DIP Credit Agreement, and no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim.

The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any liens and security interests to secure the obligations under the Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that, with respect to the Alternative Exit Facility, perfection shall occur automatically by virtue of the entry of the Confirmation Order, and with respect to an Exit Facility that occurs upon the Conversion Date, perfection occurred automatically upon entry of the Interim DIP Order, and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate

-38-

to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

The Bank of New York, London Branch, as security trustee for the secured parties under the Senior Secured FRN Indenture, and The Bank of New York, as indenture trustee under the Senior Secured FRN Indenture (collectively, the "Secured FRN Security Representatives"), are authorized and, if requested by the Debtors, directed to execute and deliver an agreement identical to that certain Access, Use and Intercreditor Agreement, by and among the Secured FRN Security Representatives, Citicorp USA, Inc., Constar and various affiliates, dated February 11, 2005, in favor of the lenders providing the Exit Facility (subject to changing names of parties, documents and addresses, as appropriate).

### E.    ISSUANCE OF NEW EQUITY

The issuance of the New Equity, including the Distribution Shares and the shares of the New Equity, options, or other equity awards, if any, reserved for the Management Incentive Plan, by Reorganized Constar is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests.

All of the shares of New Equity issued pursuant to the Second Amended Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article VI of the Second Amended Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### X.    PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE SECOND AMENDED PLAN

**PRIOR TO VOTING TO ACCEPT OR REJECT THE SECOND AMENDED PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS SECOND AMENDED DISCLOSURE STATEMENT.**

### A.    GENERAL

The following provides a summary of various important considerations and risk factors associated with the Second Amended Plan. However, it is not exhaustive. In considering whether to vote for or against the Second Amended Plan, Holders of Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Second Amended Disclosure Statement, including the various risks and other factors described in Constar's Form 10-K for the year ended December 31, 2007 and Form 10-Q for the period ended September 30, 2008, both of which are incorporated herein.

### B.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

*Parties-in-Interest May Object To Debtors' Classification of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Second Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created seven Classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*The Debtors May Not Be Able to Obtain Confirmation or Consummation of the Second Amended Plan*

US1DOCS 6890484v16

The Debtors cannot ensure that they will receive the number and amount of acceptances required to confirm the Plan. Even if the Debtors receive the requisite acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or Interest Holder might challenge the adequacy of the Disclosure Statement or the Solicitation Procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail in Article VIII hereof, entitled "Confirmation Procedures," section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While the Debtors believe that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

The Confirmation of the Second Amended Plan is also subject to certain conditions as described in Article X thereof. If the Second Amended Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Second Amended Plan, reserve the right to modify the terms of the Second Amended Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non accepting Class or Classes, as well as of any Classes junior to such non accepting Classes, than the treatment currently provided in the Second Amended Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Second Amended Plan or no distribution of property whatsoever under the Second Amended Plan.

*The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Second Amended Plan and the final DIP financing order, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest deemed Allowed under the Second Amended Plan. The estimates set forth in this Second Amended Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Second Amended Disclosure Statement.

*Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

*Contingencies Not to Affect Votes of Impaired Classes to Accept the Second Amended Plan*

The distributions available to Holders of Allowed Claims under the Second Amended Plan can be affected by a variety of contingencies, including, without limitation, whether or not the Debtors are consolidated and whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to Holders of Allowed Claims under the Second Amended Plan, however, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Second Amended Plan or require any sort of revote by the Impaired Class.

C.      **FINANCIAL INFORMATION, DISCLAIMER**

Although the Debtors have used their reasonable best efforts to ensure the accuracy of the financial information provided in this Second Amended Disclosure Statement, some of the financial information contained in this Second Amended Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Second Amended Plan and this Second Amended Disclosure Statement. While the

US1DOCS 6890484v16

Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

## D.    FACTORS AFFECTING THE DEBTORS

*Litigation and governmental investigations as a result of Debtors' operations.*

The Debtors are subject to litigation and governmental investigations resulting from their operations. While the impact of any such litigation and investigations has been immaterial to their operations and financial condition, there can be no assurance that its impact will not be material in the future. The following is a summary of a certain ongoing governmental investigation to which the Debtors are a party:

Constar and certain of its present and former directors, along with Crown Holdings, Inc., as well as various underwriters, have been named as defendants in a consolidated securities class action lawsuit filed in the United States District Court for the Eastern District of Pennsylvania, *In re Constar International Inc. Securities Litigation* (Master File No. 03-CV-05020). This action consolidates previous lawsuits, namely *Parkside Capital LLC v. Constar International Inc et al.* (Civil Action No. 03-5020), filed on September 5, 2003 and *Walter Frejek v. Constar International Inc. et al.* (Civil Action No.03-5166), filed on September 15, 2003. The consolidated and amended complaint, filed June 17, 2004, generally alleges that the registration statement and prospectus for Constar's initial public offering of its common stock on November 14, 2002 contained material misrepresentations and/or omissions. Plaintiffs claim that defendants in these lawsuits violated sections 11 and 15 of the Securities Act of 1933. Plaintiffs seek class action certification and an award of damages and litigation costs and expenses. Under Constar's charter documents, an agreement with Crown and an underwriting agreement with Crown and the underwriters, Constar has incurred certain indemnification and contribution obligations to the other defendants with respect to this lawsuit. The court has previously denied the Constar's motion to dismiss for failure to state a claim upon which relief may be granted and motion for judgment on the pleadings. On May 7, 2007, the Special Master issued a Report and Order granting plaintiffs' motion for class certification. Constar filed objections to the Special Master's Report and Order. On March 4, 2008, the Court entered an Order overruling the Constar's objections, adopting the Special Master's Report and Order, and granting plaintiffs' motion for class certification. On March 18, 2008, the Constar filed a Rule 23(f) Petition with the United States Court of Appeals for the Third Circuit seeking leave to take an immediate appeal from the class certification ruling. On April 30, 2008, the Third Circuit entered an Order granting the Constar's Rule 23(f) Petition. The Third Circuit has not yet issued a briefing schedule for the class certification appeal. At the Constar's request, the Special Master and the District Court have agreed to stay all further proceedings before the District Court pending the outcome of the appeal, with the exception of certain limited discovery. Constar believes the claims in the action are without merit and intends to defend against them vigorously. Constar cannot reasonably estimate the amount of any loss that may result from this matter.

On October 8, 2008, Marshall Packaging Co. LLC filed a complaint in the Eastern District of Texas, C. A. No. 6:08cv394, against Constar, as well as certain bottled water companies, alleging infringement of U.S. Patent No. RE 38,770, entitled "Collapsible Container," and seeking injunctive relief and monetary damages. The complaint alleges that Constar has infringed and is infringing the patent by making and selling certain beverage containers, but does not specifically identify the accused containers. Constar has not been served with process in that action, and therefore, it has not yet filed an answer to the complaint and no deadline for filing an answer has been set. Constar does not believe that it is subject to liability in connection with the patent at issue and intends to vigorously defend itself in the action. Constar cannot reasonably estimate the amount of any loss that may result from this matter.

Previously, on March 13, 2007, Marshall Packaging Co. LLC brought suit in the Eastern District of Texas, C. A. No. 6:07cv118, against Amcor PET Packaging USA Inc. and Wal-Mart Stores Inc., alleging infringement of the same patent, U.S. Patent No. RE 38,770, seeking injunctive relief and monetary damages ("the Lawsuit"). On April 5, 2007, Marshall settled with Amcor for an undisclosed amount and Amcor was subsequently dismissed from the Lawsuit. On June 29, 2007, Marshall amended its Complaint to add Premium Waters, Inc., a Wal-Mart supplier, as a defendant. On October 31, 2008, a Stipulation of Dismissal of Claims among Marshall, Premium and Wal-Mart was filed with the Court. On November 3, 2008, the Court entered an order dismissing all claims asserted against Premium and Wal-Mart with prejudice. Constar is a supplier of certain containers to Premium, and Premium previously claimed indemnity from Constar with respect to some as yet unknown portion of the containers that Premium sells to Wal-Mart. Constar does not know which or how many Constar containers are included among

those accused in the Lawsuit. Constar does not believe that it is subject to liability in connection with the patent at issue and intends to vigorously defend against any attempt to implicate its containers in the Lawsuit. Constar cannot reasonably estimate the amount of any loss that may result from this matter.

Constar has received requests for information or notifications of potential responsibility from the Environmental Protection Agency ("EPA"), and certain state environmental agencies for certain off-site locations. Constar has not incurred any significant costs relating to these matters. Constar has been identified by the Wisconsin Department of Natural Resources as a potentially responsible party at two adjacent sites in Wisconsin and agreed to share in the remediation costs with one other party. Remediation is ongoing at these sites. Constar has also been identified as a potentially responsible party at the Bush Valley Landfill site in Abingdon, Maryland and entered into a settlement agreement with the EPA in July 1997. The activities required under that agreement are ongoing. Constar's share of the remediation costs has been minimal thus far and no accrual has been recorded for future remediation at these sites.

*Other Risk Factors Relating to the Business Environment in which the Debtors Operate*

Economic Conditions and Other External Events. For the years ended December 31, 2007 and 2006, approximately 74% and 76%, respectively, of Constar's sales related to conventional PET containers which are primarily used for carbonated soft drinks and bottled water. These products typically generate lower variable profitability. Profitability is driven principally by volume and maintaining efficient manufacturing operations. In the past, the largest growth within conventional products came from bottled water. Profitability from water bottle sales has declined as economic factors have forced some water bottlers into self-manufacturing of PET bottles and some smaller water bottlers out of business. The Debtors believe that the trend towards self-manufacturing of water bottles will continue. Growth in water bottles sales may also be impacted by environmental concerns. The Debtors believe that customers may also move towards self-manufacturing of certain carbonated soft drink packages where economics can be justified. In addition, the shift to healthier beverages is driving a decline for carbonated soft drinks. Pricing and volumes in the Debtors' markets are sensitive to production capacity utilization. The Debtors' business is sensitive to industry capacity utilization. The trend towards self-manufacturing of water bottles may result in increased industry capacity, which could increase price competition and affect profitability.

If the market for custom PET packaging does not grow as large or as quickly as the Debtors' anticipate, their growth and profitability may be lower than they currently expect. The Debtors' believe that one of the keys to their future success will be their ability to sell more custom PET products. Partly because of the more complex technologies required for certain custom PET applications, profitability is generally higher for custom PET products than for conventional PET products. The Debtors' believe a number of products will convert from glass, metal and other packaging to custom PET packaging. A slow rate of conversion would limit their growth opportunities.

A significant portion of the Debtors' sales is concentrated with a small number of customers. During the first nine months of 2008 Pepsi accounted for approximately 39.3% of Constar's consolidated revenues, while the top ten customers accounted for an aggregate of approximately 75.7% of Constar's consolidated revenues. The loss or reduction of the Debtors' business with any of these significant customers could have a material adverse impact on their net sales, profitability, and cash flows. In addition, the Debtors believe that there is only a very small pool of large customers that would be available to replace the loss of one of its existing, large customers. A decrease in cash flows may cause the carrying value of the Debtors' assets to become unrecoverable and could cause a write-down of assets due to impairment.

The loss of the Debtors' intellectual property rights, for which they enjoy limited protection, would negatively impact their ability to compete in the PET industry. If they are unable to maintain the proprietary nature of their technologies, they may lose the ability to generate royalties in the future by licensing their patented technologies and their competitors may use their technologies to compete with them. The Debtors have a number of patents covering various aspects of the design and construction of their products, including their Oxbar ™ technology. The Debtors' United States and European Oxbar ™ patents began to expire in 2008.

The Debtors' patents may not withstand challenge in litigation, and patents do not ensure that competitors will not develop competing products, design around their patents or infringe upon their patents. The costs of litigation to defend the Debtors' patents could be substantial and may outweigh the benefits of enforcing their rights

-42 -

under their patents. The Debtors market their products internationally and the patent laws of foreign countries may offer less protection than the patent laws of the United States. Not all of the Debtors' domestic patents have been registered in other countries. The Debtors also rely on trade secrets, know-how and other unpatented proprietary technology, and others may independently develop the same or similar technology or otherwise obtain access to their unpatented technology. To protect the Debtors' trade secrets, know-how and other proprietary information, they require employees, consultants, advisors and collaborators to enter into confidentiality agreements with them. These agreements may not provide meaningful protection for their trade secrets, know-how or other proprietary information in the event of any unauthorized use, misappropriation or disclosure of this information. In addition, the Debtors have from time to time received letters from third parties suggesting that they may be infringing on their intellectual property rights, and third parties may bring infringement suits against us. If the claims of these third parties are successful, the Debtors may be required to seek licenses from these third parties or refrain from using the claimed technology. In addition, other parties use oxygen barrier technologies, and to the extent the Debtors determine that any such technologies infringe upon their patents, they may have to bring infringement suits to enforce their patent rights. In any such infringement suit, a defendant would likely seek to invalidate the patents at issue.

The Debtors have licensed Oxbar ™ to some of their competitors which may allow their licensed competitors to compete more effectively with them. The Debtors have licensed to some of their competitors certain applications of their Oxbar ™ technology. This may offset some of the competitive advantage offered by Oxbar ™ and allow their licensed competitors to compete more effectively with them. The Debtors may also license other technologies that currently exist or that they may develop in the future. Any such licensing activity may harm their competitive position.

The competitive advantages of the Debtors' Oxbar ™ technology may also be weakened by the sublicense rights held by a third party. Oxbar ™ technology is subject to a worldwide royalty-free cross-license with Rexam AB, which owns several patents relating to oxygen-scavenging technology. The cross-license agreement gives both parties the right to use and sublicense each other's oxygen scavenging technology patents, but not each other's know-how. The competitive advantages that the Debtors believe can be achieved through Oxbar ™ may not be fully realized to the extent that Rexam uses Oxbar ™ to compete with them or sublicenses Oxbar ™ to any of their existing or potential competitors or customers, or other third parties. From time to time the Debtors have attempted to negotiate a new agreement with Rexam to modify their respective rights to Oxbar ™, but to date no such agreement has been concluded and such an agreement may never be concluded.

The Debtors products and services may become obsolete. Significant technological changes could render the Debtors' existing technology or their products and services obsolete. The markets in which the Debtors operate are characterized by rapid technological change, frequent new product and service introductions and evolving industry standards. Their ability to compete may be weakened if their existing technologies are rendered obsolete. If the Debtors are unable to respond successfully to technological developments or do not respond in a cost-effective way, or if they do not develop new technologies, their net sales and profitability may decline. To be successful, the Debtors must adapt to rapidly changing markets by continually improving their products and services and by developing new products and services to meet the needs of their customers. The Debtors' ability to develop these products and services will depend, in part, on their ability to license leading technologies useful in their business and develop new offerings and technology that address the needs of their customers. Similarly, the equipment that the Debtors use may be rendered obsolete by new technologies. A significant investment in new equipment may reduce their profitability.

Consolidation of the Debtors' customers may increase their negotiating leverage and reduce the Debtors' net sales and profitability. If one of their larger customers acquires one of their smaller customers, or if two of their customers merge, the combined customer's negotiating leverage with the Debtors may increase and their business with the combined customer may become less profitable. In addition, if one of the Debtors' customers is acquired by a company that has a relationship with one of the Debtors' competitors, they may lose that customer's business. The consolidation of purchasing power through buyer cooperatives or similar organizations may also harm the Debtors' profitability.

Competition. Competition from producers of other forms of packaging and the Debtors' competitors within the PET industry may cause their customers to purchase other types of packaging or to purchase PET

US1DOCS 6890484v16

containers from their competitors, which may reduce the Debtors' net sales and profitability. PET containers compete in the packaging market with other plastic containers, glass bottles, metal cans, paperboard cartons and other materials. Changes in the relative cost and quality of other packaging materials may reduce the market for PET containers. Some of the Debtors' competitors have greater financial, technical and marketing resources than the Debtors do. The Debtors' current or potential competitors may offer products at a lower cost or products that are superior to theirs. In addition, their competitors may be more effective and efficient in integrating new technologies. Many of the Debtors' contracts (and typically their most significant contracts) provide that their customers may purchase from an alternative source if the Debtors cannot provide products that are of similar quality at an equivalent price. If the Debtors lower prices in response to such provisions, or if they lose a significant amount of business from one or more customers, their net sales and profitability may decline.

In addition to competition with other independent suppliers of PET packaging, some of the Debtors' potential customers produce their own PET containers. Coca-Cola, one of the largest end-users of conventional PET containers in the United States, self-manufactures its own PET preforms and blows its own bottles. Some of the Debtors' customers have developed in-house preform production and bottle blowing capacity, and they believe that this trend is accelerating. This may reduce the Debtors' sales and their profitability. In addition, if self-manufacturing results in merchant suppliers having significant excess capacity, price competition may increase.

The Debtors use large quantities of plastic resin in manufacturing their products and increases in the price of resin may increase their cost of products sold, reduce their profitability and reduce their prospects for growth. Resin is the principal raw material used in the manufacture of the Debtors' products. Resin is subject to substantial price fluctuations. Resin is a petrochemical product and resin prices may fluctuate with prices in the worldwide oil and gas markets. Political or economic events in oil or gas producing countries, such as those in the Middle East, may impact the price of resin. The Debtors are subject to the risk of fluctuations in the price of resin. Although substantially all of the Debtors' sales are made pursuant to mechanisms that permit them to pass changes in the price of resin through to their customers, market conditions may not permit them to fully pass through any future resin price increases or may force them to grant other concessions to customers. In addition, the arrangements that the Debtors make to limit their exposure to fixed or other resin pricing mechanisms may not operate as expected, including under circumstances where their resin suppliers are unable or unwilling to perform. Resin price increases against which the Debtors are not protected may have a material adverse impact on their business. Significant increases in resin prices, coupled with an inability to promptly pass such increases on to customers, may increase their cost of products sold and reduce their profitability. A sustained increase in the price of resin may slow the rate of conversion of alternative packaging materials, such as glass and metal, to PET, or may make these alternative packaging materials more attractive than PET. A sustained increase in the price of resin may also result in an increased price to consumers, which may affect consumer preference for PET packaging. If these factors reduce the demand for PET packaging, it may significantly reduce our prospects for growth.

If the Debtors' suppliers are unable to meet their requirements for resin, it may prevent the Debtors from manufacturing their products. The Debtors' suppliers may not continue to provide resin to them at attractive prices, or at all, and they may not be able to obtain resin in the future from these or other suppliers on the scale and within the time frames the Debtors require. Any failure to obtain resin on a timely basis at an affordable cost, or any significant delays or interruptions of supply, could prevent the Debtors from supplying their customers on a timely basis.

In both the United States and Europe, the Debtors' purchasing portfolio for resin often includes a component of imported resin from Asia or other foreign markets. Greater shipping distances, government actions, political unrest, tariffs, local market conditions in the exporting region, and other issues may affect supplier reliability and cause greater risk of supply disruption for such imported resin.

The Debtors' business relies on specialized manufacturing equipment that is produced by a small number of suppliers. If any of these suppliers increases its prices significantly, goes out of business or is otherwise unable to meet the Debtors' requirements for necessary equipment, the Debtors may be unable to expand their operations. This may significantly reduce their prospects for growth.

Unseasonably cool weather during a summer could reduce the Debtors' sales and profitability. A significant portion of the Debtors' revenue is attributable to the sale of beverage containers. Demand for beverages

-44-

tends to peak during the summer months. In the past, significant changes in summer weather conditions have affected the demand for beverages, which in turn affects the demand for beverage containers manufactured by the Debtors. As a result of the seasonal nature of the Debtors' business, cash flow requirements are the greatest in the first several months of each fiscal year because of the increased working capital required to build inventory for the warmer months and because of lower levels of profitability associated with softer sales during the first few months of each fiscal year. A cool summer may have a significant impact on cash flow because of lower profitability and the impact on working capital.

The Debtors are subject to foreign currency risk and other instabilities from their international operations. For the years ended December 31, 2007 and 2006, the Debtors derived approximately 22% and 19%, respectively of our revenue from sales in foreign currencies. In the Debtors' financial statements, they translate local currency financial results into United States dollars based on average exchange rates prevailing during a reporting period. The Debtors' most significant foreign currency exposures are to the British pound and the Euro. During times of a strengthening United States dollar, the Debtors' reported international revenue and earnings will be reduced because the local currency will translate into fewer United States dollars.

As a result of the Debtors' international operations, they are also subject to risks associated with operating in foreign countries, including changes in governmental policies and regulations, war, acts of terrorism and other sources of instability. The Debtors are also at risk for acts of terrorism in the United States. These risks may negatively impact the Debtors' financial condition and results of operations.

Higher energy costs or frequent or sustained power interruptions may increase our operating costs and limit the Debtors' ability to supply their customers. Electrical power is vital to the Debtors' operations and they rely on a continuous power supply to conduct their business. If energy costs substantially increase in the future, the Debtors could experience a significant increase in operating costs. In addition, the Debtors have experienced power interruptions at their manufacturing facilities, particularly during severe weather conditions. Frequent or sustained power interruptions, particularly at the Debtors' larger manufacturing facilities, may limit their ability to supply their customers and negatively impact their business.

The Debtors' facilities and operations are subject to federal, state, local and foreign environmental and employee health and safety laws and regulations, including those regarding the use, storage, handling, generation, transportation, treatment, emission and disposal of certain substances and remediation of environmental impacts to soil and groundwater. The nature of the Debtors' operations exposes them to the risk of liabilities or claims with respect to environmental and worker health and safety matters.

E.      **CERTAIN TAX MATTERS**

For a summary of certain federal income tax consequences of the Plan to certain Holders of Claims and to the Debtors, see Article XII below, entitled "Certain U.S. Federal Income Tax Consequences."

F.      **RISK THAT THE INFORMATION IN THIS SECOND AMENDED DISCLOSURE STATEMENT MAY BE INACCURATE**

The statements contained in this Second Amended Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Second Amended Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Debtors may subsequently update the information in this Second Amended Disclosure Statement, but they have no duty to update this Second Amended Disclosure Statement unless ordered to do so by the Court. Further, the proforma and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Second Amended Disclosure Statement, the Second Amended Plan, or any Exhibits thereto.

### G.   LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Article VII above, entitled "Valuation Analysis and Financial Projections," and Exhibit B.

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE SECOND AMENDED PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

## XI.   SECURITIES LAW MATTERS

### A.   PLAN SECURITIES

The Plan provides for the Reorganized Debtors to issue the New Equity (the "Plan Securities") to Holders of Claims in Class 4.  A portion of the New Equity will be issued in accordance with, or reserved for issuance in accordance with, the Management Incentive Plan (if any).

The Debtors believe that all of the Plan Securities constitute "securities," as defined in section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable state securities laws. The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Second Amended Plan, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

### B.   ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE SECOND AMENDED PLAN

#### 1.   Exemption from Registration

Section 4(2) of the Securities Act provides that section 5 of the Securities Act and, by virtue of section 18 of the Securities Act, any state law requirements for the offer and sale of a security do not apply to transactions not involving any public offering. Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state securities laws. To the extent that the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and

in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability. If the Plan Securities are not covered by section 1145 of the Bankruptcy Code, the Plan Securities will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. **Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 to the Plan Securities and the availability of any exemption from registration under federal and state law in the event that section 1145 is not applicable to the Plan Securities.**

### 2.    Resales of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under a plan for the holders of such securities, or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act. The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, Reorganized Constar does not presently intend to make publicly available the requisite current information regarding Reorganized Constar, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Plan Securities. **Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.**

-47-

## XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Second Amended Plan to the Debtors and the Reorganized Debtors and certain Holders of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Second Amended Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Second Amended Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Second Amended Plan, nor does it purport to address the federal income tax consequences of the Second Amended Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE SECOND AMENDED PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE SECOND AMENDED DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND THE REORGANIZED DEBTORS**

The Debtors expect to report consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $96 million as of the Petition Date. As discussed below, the amount of the Debtors' NOL carryforwards may be significantly reduced or eliminated upon implementation of the Plan. In addition, the Reorganized Debtors' subsequent utilization of any losses and NOL carryforwards remaining and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

### 1.    REDUCTION OF NOLS

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes, such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets, by the amount of any cancellation of indebtedness ("COD") realized upon consummation of the Second Amended Plan. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).

As a result of Consummation of the Second Amended Plan, and in particular the cancellation of some Claims and exchange of other Claims for Cash or New Equity, the Debtors expect to realize substantial COD. The extent of such COD and resulting tax attribute reduction will depend significantly on both the value of the New Equity and the amount of Cash distributed. Based on the estimated reorganization value of the Reorganized Debtors, it is anticipated that there will be material reductions in the consolidated NOL carryforwards and current year NOLs of the Reorganized Debtors. Indeed, it is likely that the amount of COD will exceed the amount of the NOLs thereby eliminating the NOLs and also reducing the Reorganized Debtors' tax basis in their assets.

### 2.    LIMITATION ON NOL CARRYFORWARDS AND OTHER TAX ATTRIBUTES

Following the implementation of the Second Amended Plan, the Debtors anticipate that any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under section 382 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Second Amended Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed more fully herein, although the Debtors have taken steps to ensure that an "ownership change" will not occur prior to the implementation of the Second Amended Plan, the Debtors anticipate that the issuance of the New Equity pursuant to the Second Amended Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their NOL carryforwards, if any, will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### 3.    PRE-CONFIRMATION MEASURES

To ensure that no "ownership change" occurs prior to the Confirmation of the Second Amended Plan, on the Petition Date the Debtors entered a motion requesting an order restricting trading in the equity securities of Constar by certain "substantial" shareholders who hold 4.75% or more of the value of such securities. On January 21, 2009, the Court entered that order. These restrictions will become irrelevant once the Second Amended Plan is confirmed and the Equity Interests are cancelled.

### 4.    GENERAL SECTION 382 ANNUAL LIMITATION

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, approximately 5.40%). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

### B.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLASS 1, CLASS 2, CLASS 3 AND CLASS 5 CLAIMS

Pursuant to the Second Amended Plan, Holders of Class 1 – Other Priority Claims, Class 2 – Senior Secured FRN Claims, Class 3 – Other Secured Claims, and Class 5 – Other General Unsecured Claims whose Claims are not Reinstated will receive Cash in full payment of their Claims. A Holder who receives Cash in

exchange for its Claim pursuant to the Second Amended Plan generally will recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim and (2) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See discussions of accrued interest and markets discounts below.

C.      **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLASS 4 CLAIMS**

Pursuant to the Second Amended Plan, in full satisfaction and discharge of their Claims, Holders of Class 4 – Senior Subordinated Note Claims will receive New Equity. The U.S. federal income tax consequences of the Second Amended Plan to such Holders of Claims will depend, in part, on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Senior Subordinated Notes have a term of approximately ten years.

If a Holder's Claims are treated as securities the exchange of such Claims for New Equity should be treated as a recapitalization and therefore a tax-free reorganization under the Tax Code. In general, this means that a Holder will not recognize loss with respect to the exchange and will not recognize gain except with respect to accrued but unpaid interest on the Claims. A Holder should obtain a tax basis in the New Equity equal to the tax basis of the Claims exchanged therefore. A Holder should have a holding period for the New Equity that includes the holding period for the Claims; provided that the tax basis of any share of New Equity treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such share of New Equity should not include the holding period of the Claims.

If a Holder's Claims are not treated as "securities" for federal income tax purposes, a Holder should be treated as exchanging its Claims for New Equity in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the New Equity received that is not allocable to accrued interest and (2) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that a portion of the New Equity received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See the discussion of accrued interest below. A Holder's tax basis in the New Equity should equal their fair market value as of the Effective Date. A Holder's holding period for the New Equity should begin on the day following the Effective Date.

D.      **ACCRUED INTEREST**

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

E.      **MARKET DISCOUNT**

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for New Equity on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (1) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (2) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered Claims that had been acquired with market discount are deemed to be exchanged for New Equity in a tax-free reorganization, any market discount that accrued on such debts but was not recognized by the Holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of the New Equity to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE SECOND AMENDED PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE SECOND AMENDED PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### XIII.  CONCLUSION AND RECOMMENDATION

The Debtors believe the Second Amended Plan is in the best interests of all creditors and urge the Holders of Claims entitled to vote to accept the Second Amended Plan and to evidence such acceptance by returning their Ballots so they will be received by the Debtors' Voting Agent no later than **April __, 2009**.

Dated February 3, 2009

Respectfully submitted,

Constar International Inc., et al.

By: /s/ Walter Sobon
Its:  Chief Financial Officer

Prepared by:

US1DOCS 6890484v16

BAYARD, P.A.
Neil B. Glassman, Esq. (No. 2087)
Jamie L. Edmonson, Esq. (No. 4247)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

WILMER CUTLER PICKERING HALE AND DORR LLP
Andrew N. Goldman, Esq.
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Eric R. Markus, Esq.
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 663-6000
Facsimile:  (202) 663-6363

Attorneys for the Debtors and Debtors in Possession

US1DOCS 6890484v16