**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONSTAR INTERNATIONAL INC., et al.,[1] | ) | Case No. 08-13432 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS'
~~FIRST~~SECOND AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

DATED ~~JANUARY___, 2008~~FEBRUARY 3, 2009

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT, REGARDING THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "~~FIRST~~SECOND AMENDED PLAN") OR THE SOLICITATION OF ACCEPTANCES OF THE ~~FIRST~~SECOND AMENDED PLAN .

ALL CLAIMHOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE ~~FIRST~~SECOND AMENDED PLAN  IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE ~~FIRST~~SECOND AMENDED PLAN.   PLAN SUMMARIES AND STATEMENTS MADE IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ~~FIRST~~SECOND AMENDED PLAN  AND OTHER EXHIBITS ANNEXED TO THE ~~FIRST~~SECOND AMENDED PLAN  AND THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE DEADLINE FOR VOTING TO ACCEPT OR REJECT THE ~~FIRST~~SECOND AMENDED PLAN  IS 4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL _., 2009, UNLESS EXTENDED.   TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY SUCH DEADLINE.

THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS ~~FIRST~~SECOND

---

[1] The Debtors and the last four digits of their respective tax identification numbers are:  Constar International Inc. (XX-XXX9304), BFF, Inc. (XX-XXX1229), DT, Inc. (XX-XXX7693), Constar, Inc. (XX-XXX0950), Constar Foreign Holdings, Inc (XX-XXX8591) and Constar International U.K. Limited.   The address of Constar International Inc., BFF, Inc., DT, Inc., Constar, Inc. and Constar Foreign Holdings, Inc. is One Crown Way, Philadelphia, Pennsylvania 19154. The address of Constar International U.K. Limited is Moor Lane Trading Estate, Sherburn in Elmet, Nr Leeds, North Yorkshire LS25 6ES, UK.

AMENDED DISCLOSURE STATEMENT AND THE ~~FIRST~~SECOND AMENDED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE ~~FIRST~~SECOND AMENDED PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE ~~FIRST~~SECOND AMENDED PLAN, EVENTS LEADING TO THESE BANKRUPTCY CASES AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE ~~FIRST~~SECOND AMENDED PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE ~~FIRST~~SECOND AMENDED PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE ~~FIRST~~SECOND AMENDED PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE BANKRUPTCY CASES) INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS OR ANY OF THEIR SUBSIDIARIES. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

THE BOARDS OF DIRECTORS OF CONSTAR INTERNATIONAL INC., ALL OF ITS WHOLLY-OWNED DIRECT SUBSIDIARIES AND ONE OF ITS WHOLLY-OWNED INDIRECT SUBSIDIARIES HAVE UNANIMOUSLY APPROVED THE SOLICITATION, THE ~~FIRST~~SECOND AMENDED PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY AND RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE ~~FIRST~~SECOND AMENDED PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE ~~FIRST~~SECOND AMENDED PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.

**ALL EXHIBITS TO THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

Prepared By:

<table>
<tr>
<td>

BAYARD, P.A.<br>
Neil B. Glassman, Esq. (No. 2087)<br>
Jamie L. Edmonson, Esq. (No. 4247)<br>
222 Delaware Avenue, Suite 900<br>
P.O. Box 25130<br>
Wilmington, Delaware 19899<br>
Telephone: (302) 655-5000<br>
Facsimile: (302) 658-6395

</td>
<td>

WILMER CUTLER PICKERING HALE AND DORR LLP<br>
Andrew N. Goldman, Esq.<br>
399 Park Avenue<br>
New York, New York 10022<br>
Telephone: (212) 230-8800<br>
Facsimile: (212) 230-8888<br>
<br>
Eric R. Markus, Esq.<br>
1875 Pennsylvania Avenue, N.W.<br>
Washington, D.C. 20006<br>
Telephone: (202) 663-6733<br>
Facsimile: (202) 663-6363

</td>
</tr>
</table>

Attorneys for the Debtors and Debtors in Possession

US1DOCS 6890484v1516

**I. INTRODUCTION** ............................................................................................................. ~~1~~3

    A.    PURPOSE AND EFFECT OF THE ~~FIRST~~SECOND AMENDED PLAN ..................... ~~1~~3
    B.    OVERVIEW OF CHAPTER 11 ............................................................................. ~~1~~3
    C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE ~~FIRST~~SECOND AMENDED PLAN ..................... ~~2~~3
    D.    PARTIES ENTITLED TO VOTE ON THE ~~FIRST~~SECOND AMENDED PLAN ....................... ~~2~~3
    E.    SOLICITATION PACKAGE ......................................................................................... 3
    F.    VOTING INSTRUCTIONS .......................................................................................... 3
    G.    THE CONFIRMATION HEARING ............................................................................ 3
    H.    CONFIRMING AND CONSUMMATING THE ~~FIRST~~SECOND AMENDED PLAN ............... 3

**II. BACKGROUND** ............................................................................................................. 3

    A.    OVERVIEW OF THE COMPANY'S BUSINESS .......................................................... 3
    B.    THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE ....................................... ~~4~~3
    C.    SUMMARY OF PREPETITION INDEBTEDNESS AND OTHER FINANCINGS AS OF THE PETITION DATE ......................................................................................................... ~~5~~3

**III. CHAPTER 11 CASES** .................................................................................................... ~~6~~3

    A.    EVENTS LEADING TO THE CHAPTER 11 CASES ................................................... ~~6~~3
    B.    EVENTS OF THE CHAPTER 11 CASES .................................................................. ~~7~~3

**IV. THE JOINT ~~FIRST~~SECOND AMENDED PLAN** .................................................................. ~~9~~3

    A.    INTRODUCTION ........................................................................................................ ~~9~~3
    B.    ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...................................... ~~10~~3
    C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......................... ~~10~~3
    D.    TREATMENT OF CLAIMS AND INTERESTS ............................................................ ~~11~~3
    E.    SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS ..................................... ~~12~~3
    F.    ACCEPTANCE OR REJECTION OF THE ~~FIRST~~SECOND AMENDED PLAN ................... ~~12~~3
    G.    MEANS FOR IMPLEMENTATION OF THE ~~FIRST~~SECOND AMENDED PLAN ................. ~~12~~3
    H.    PROVISIONS GOVERNING DISTRIBUTIONS ........................................................... ~~16~~3
    I.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS .................................................................................................................... ~~17~~3
    J.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..................... ~~18~~3
    K.    ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS ................... ~~21~~3
    L.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE ~~FIRST~~SECOND AMENDED PLAN ................................................................................. ~~22~~3
    M.    GOVERNING LAW .................................................................................................. ~~22~~3
    N.    REVOCATION, WITHDRAWAL, MODIFICATION OR AMENDMENT OF THE ~~FIRST~~SECOND AMENDED PLAN ................................................................................. ~~23~~3

**V. RETENTION OF JURISDICTION** ..................................................................................... ~~23~~3

**VI. SOLICITATION AND VOTING PROCEDURES** .................................................................. ~~25~~3

    A.    THE SOLICITATION PACKAGE .............................................................................. ~~25~~3
    B.    VOTING INSTRUCTIONS ......................................................................................... ~~26~~3
    C.    VOTING TABULATION ............................................................................................ ~~27~~3

D.     VOTES SOLICITED IN GOOD FAITH ................................................ 28~~2~~3

**VII. VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ........................................ 28~~2~~3

    A.     VALUATION OF THE REORGANIZED DEBTORS. ................................ 28~~2~~3
    B.     FINANCIAL PROJECTIONS ................................................................ 30~~2~~3

**VIII. CONFIRMATION PROCEDURES** ............................................................................ 32~~2~~3

    A.     THE CONFIRMATION HEARING ...................................................... 32~~2~~3
    B.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE ~~FIRST~~SECOND
            AMENDED PLAN ................................................................................ 32~~2~~3
    C.     RISK FACTORS .................................................................................. 36~~2~~3
    D.     IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION .............. 36~~2~~3
    E.     DISCLAIMER ...................................................................................... 36~~2~~3

**IX. IMPLEMENTATION OF THE ~~FIRST~~SECOND AMENDED PLAN AND POSTPETITION
    GOVERNANCE OF REORGANIZED DEBTORS** ............................................ 37~~2~~3

    A.     BOARD OF DIRECTORS AND MANAGEMENT .............................. 37~~2~~3
    B.     INDEMNIFICATION OF DIRECTORS AND OFFICERS ...................... 37~~2~~3
    C.     MANAGEMENT INCENTIVE PLAN .................................................. 37~~2~~3
    D.     EXIT FINANCING ............................................................................ 37~~2~~3
    E.     ISSUANCE OF NEW EQUITY .......................................................... 38~~2~~3

**X. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND
    CONSUMMATING THE ~~FIRST~~SECOND AMENDED PLAN** ........................................ 38~~2~~3

    A.     GENERAL ........................................................................................ 38~~2~~3
    B.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS ........................ 39~~2~~3
    C.     FINANCIAL INFORMATION, DISCLAIMER .................................... 40~~2~~3
    D.     FACTORS AFFECTING THE DEBTORS .......................................... 40~~2~~3
    E.     CERTAIN TAX MATTERS ................................................................ 45~~2~~3
    F.     RISK THAT THE INFORMATION IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE
            STATEMENT MAY BE INACCURATE .............................................. 45~~2~~3
    G.     LIQUIDATION UNDER CHAPTER 7 .............................................. 45~~2~~3

**XI. SECURITIES LAW MATTERS** .................................................................................... 45~~2~~3

    A.     PLAN SECURITIES .......................................................................... 45~~2~~3
    B.     ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE ~~FIRST~~SECOND
            AMENDED PLAN ................................................................................ 46~~2~~3

**XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** .................................. 47~~2~~3

    A.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
            DEBTORS AND THE REORGANIZED DEBTORS .......................... 48~~2~~3
    B.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
            HOLDERS OF CLASS 1, CLASS 2, CLASS 3 AND CLASS 5 CLAIMS ................ 49~~2~~3
    C.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE
            HOLDERS OF CLASS 4 CLAIMS .................................................... 49~~2~~3
    D.     ACCRUED INTEREST ...................................................................... 50~~2~~3
    E.     MARKET DISCOUNT ........................................................................ 50~~2~~3

**XIII. CONCLUSION AND RECOMMENDATION** ............................................................ 50~~2~~3

## EXHIBITS

| | | |
|---|---|---|
| **Exhibit A** | - | Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code |
| **Exhibit B** | - | Liquidation Analysis |
| **Exhibit C** | - | Financial Projections |

## I. INTRODUCTION

The Debtors hereby submit this ~~First~~second amended disclosure statement (the "~~First~~Second Amended Disclosure Statement")[2] pursuant to section 1125 of Title 11, United States Code §§ 101 *et. seq.* (the "Bankruptcy Code") in connection with the solicitation of acceptances of the *Debtors' ~~First~~Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code,* dated ~~January ___,~~February 3, 2009, as the same may be amended from time to time (the "~~First~~Second Amended Plan"). A copy of the ~~First~~Second Amended Plan is attached hereto as <u>Exhibit A</u>.

## A.     PURPOSE AND EFFECT OF THE ~~FIRST~~SECOND AMENDED PLAN

The primary purpose of the ~~First~~Second Amended Plan is to effectuate the following restructuring transactions:

(a)     Constar will exchange [_____]10 shares of common equity of the Company ("New Equity") for every $1,000 of principal amount of the 11% Senior Subordinated Notes due 2012 (the "Senior Subordinated Notes"). On the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Senior Subordinated Notes, each Holder of such Senior Subordinated Note Claims (the "Senior Subordinated Noteholders") shall receive its Pro Rata portion of the ~~new equity to be issued on~~Distribution Shares. Upon the Effective Date ~~or reserved for issuance as of the Effective Date (the "New Equity"), excluding shares of New Equity, if any, reserved for,~~ the Senior Subordinated Noteholders shall receive 100% of the New Equity subject to any dilution arising from the Management Incentive Plan ~~(the "Distribution Shares")~~, and the Reorganized Debtors shall pay in cash in full all reasonable fees and expenses of the Senior Subordinated Note Trustee.

(b)     On the Effective Date, all Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Equity Interests; and

(c)     The Debtors shall either (i) convert the DIP Facility into an Exit Facility on the Conversion Date; or (ii) if the Debtors elect not to convert the DIP Facility and have negotiated an Alternative Exit Facility sufficient to repay in full the DIP Facility and to fund the Debtors' operations, upon the Effective Date, the Debtors shall enter into such Alternative Exit Facility. The Exit Facility may be used for any purpose permitted thereunder.

## B.     OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date (the "Petition Date"). The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

---

[2]     Unless otherwise defined in this Disclosure Statement, all capitalized terms used but not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

A "prearranged" plan of reorganization is one in which the debtor negotiates the primary terms of the plan of reorganization with certain affected creditors before filing for bankruptcy. Solicitation of acceptances then take place shortly after the bankruptcy filing. Because negotiation of the terms of the plan take place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.

**C.** **SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE ~~FIRST~~SECOND AMENDED PLAN**

The following chart summarizes distributions to Holders of Allowed Claims and Equity Interests under the ~~First~~Second Amended Plan .[3] The recoveries set forth below are projected recoveries and may change based upon changes in Allowed Claims and proceeds available.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | 100.00% |
| 2 | Senior Secured FRN Claims | Unimpaired | 100.00% |
| 3 | Other Secured Claims | Unimpaired | 100.00% |
| 4 | Senior Subordinated Note Claims | Impaired | Pro rata share of New Equity (excluding shares, if any reserved for Management Incentive Plan) |
| 5 | Other General Unsecured Claims[4] | Unimpaired | 100.00% |
| 6 | Section 510(b) Claims | Impaired | 0% |
| 7 | Equity Interests | Impaired | 0% |

**D.** **PARTIES ENTITLED TO VOTE ON THE ~~FIRST~~SECOND AMENDED PLAN**

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan. Holders of Claims not impaired by the ~~First~~Second Amended Plan are deemed to accept the ~~First~~Second Amended Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the ~~First~~Second Amended Plan. Holders of Claims or Equity Interests Impaired by the ~~First~~Second Amended Plan and receiving no distribution under the ~~First~~Second Amended Plan are not entitled to vote because they are deemed to have rejected the ~~First~~Second Amended Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the ~~First~~Second Amended Plan and the Classes that are not entitled to vote on the ~~First~~Second Amended Plan :

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Senior Secured FRN Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Senior Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims[5] | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[3] This chart is only a summary of the classification and treatment of Allowed Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.

[4] Distributions to this Class will include cure amounts, if any, due on contracts the Debtors are assuming pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

For a detailed description of the Classes of Claims and the Classes of Equity Interests, as well as their respective treatment under the ~~First~~Second Amended Plan, see Article III of the ~~First~~Second Amended Plan .

**E.      SOLICITATION PACKAGE**

For a detailed description of the Solicitation Package (defined below), see Article VI hereof, entitled "Solicitation and Voting Procedures."

**F.      VOTING INSTRUCTIONS**

For a detailed description of the voting instructions, see Article VI hereof, entitled "Solicitation and Voting Procedures."

**G.      THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the ~~First~~Second Amended Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the ~~First~~Second Amended Plan .

The Debtors intend to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**H.      CONFIRMING AND CONSUMMATING THE ~~FIRST~~SECOND AMENDED PLAN**

It is a condition to Confirmation of the ~~First~~Second Amended Plan  that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Agent. In addition, certain other conditions contained in the ~~First~~Second Amended Plan  must be satisfied or waived pursuant to the provisions of Article X of the ~~First~~Second Amended Plan .

Following Confirmation, the ~~First~~Second Amended Plan  will be consummated on the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article X of the ~~First~~Second Amended Plan  have been (i) satisfied or (ii) waived pursuant to Article X of the ~~First~~Second Amended Plan  (the "Effective Date").

For further information, see Article IV.L hereof, entitled "The Joint Plan- Conditions Precedent to Confirmation and Consummation of the Plan."

## II. BACKGROUND

**A.      OVERVIEW OF THE COMPANY'S BUSINESS**

Constar International Inc., a Delaware corporation ("Constar"), and its subsidiaries are a global producer of and one of the largest North American suppliers of polyethylene terephthalate ("PET") plastic containers for conventional PET applications, primarily designed and manufactured for soft drinks and water. Constar also has an

---

[5] Distributions to this Class will include cure amounts, if any, due on contracts the Debtors are assuming pursuant to the Plan.

expanding position in the growing custom PET market, designed for food, juices, teas, sport drinks, new age beverages and beer.

Constar was a major international participant in the rapid growth of two-liter PET soft drink bottles in the early 1980s, the introduction of single serve soft drink bottles for convenience sales in the 1990s, and the development of the bottled water market. Headquartered in Philadelphia, Pennsylvania, Constar employs approximately 1,300 employees in the United States and Europe. Constar currently has 13 plants in the United States, and 2 plants in Europe.

Constar manufactures PET containers for two product types: conventional PET and custom PET. The conventional PET container business consists of high volume production of containers for use in packaging soft drinks and water. In 2007, conventional PET products represented approximately 74% of Constar's sales. In contrast, custom PET container applications include food, juices, teas, sport drinks, new age beverages, household chemicals, beer and flavored alcoholic beverages. The containers for custom PET applications generally require more complex manufacturing processes, unique materials, innovative product designs and technological know-how. Custom PET products represented approximately 22% of Constar's sales in 2007. Constar also produces plastic closures and other non-PET containers, representing approximately 4% of sales in 2007.

Constar primarily manufactures and sells bottles in the United States and preforms[6] in Europe. Approximately 78% of Constar's 2007 revenue was attributable to sales in the United States and the remainder was attributable to sales in Europe. Constar's customers are global, international consumers of Constar products who rely on the interconnected nature of Constar's business to supply them.

Generally, Constar supplies its customers (both domestic and international) pursuant to contracts with terms of one year or longer. Substantially all of Constar's sales are under contracts containing provisions that allow for the pass-through of changes in the price of PET resin, the primary raw material and component cost of Constar's products, under various timing mechanisms.

Constar's top global customer, Pepsi, accounted for approximately 38% of its sales in 2007. On October 10, 2008, the Company executed a new four-year cold fill supply agreement with Pepsi. Under the terms of this new agreement, effective January 1, 2009, the Company expects that there will be an approximately 30% reduction in cold fill volume as compared to 2008 with a shift towards fewer bottles and more preforms, but on improved economic terms. The new agreement with Pepsi provides the Company with the exclusive right to supply, subject to certain exceptions, 100% of the volume required at specified Pepsi filling locations. The term of the new agreement may be extended for a fifth year at Pepsi's option.

## B.    THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

Constar is the parent of four wholly-owned subsidiaries: BFF, Inc., a Delaware corporation, DT, Inc., a Delaware corporation, Constar, Inc., a Pennsylvania corporation, and Constar Foreign Holdings, Inc., a Delaware corporation ("Holdings"). Holdings, in turn, is the parent of three wholly-owned foreign subsidiaries: Constar International Holland (Plastics) B.V., a Dutch *besloten vennootschap* ("Constar Holland"), Constar Plastics of Italy S.r.l., an Italian *società responabiliàt* ("Constar Italy"), and Constar International U.K. Limited, a United Kingdom limited company ("Constar UK").

Constar was an independent publicly-held corporation from 1969 until 1992, when it was purchased by Crown Cork & Seal Company, Inc. ("Crown") and became a wholly-owned subsidiary of Crown. On November 20, 2002, Crown sold 10.5 million shares of its stock in Constar, comprising most of its equity in the company, through an initial public offering (the "IPO"). Since the IPO, Constar has again been a public company and its common stock has been listed on the National Market System of The NASDAQ Stock Market (now known as the NASDAQ Global Market ("NASDAQ")) under the symbol "CNST." As of December 31, 2007, Crown owned 1,255,000 shares, or approximately 10%, of Constar's common stock.

---

[6] Preforms are test-tube shaped intermediate products in certain blow-molding applications.

As of November 10, 2008, 12,952,309 shares of Constar's Common Stock were issued and outstanding. There are no shares of preferred stock issued or outstanding. On September 10, 2008, Constar was given notice by NASDAQ that for 30 consecutive trading days its common stock had not maintained a minimum market value of publicly held shares of $15 million as required for continued listing as set forth in Marketplace Rule 4450(b)(3). On December 30, 2008, the Company was given notice by the NASDAQ Stock Market that, in connection with the Company's chapter 11 filing and in accordance with Nasdaq Marketplace Rules 4300, 4450(f) and IM-4300, the Nasdaq staff has determined that the Company's common stock will be delisted from The Nasdaq Stock Market. Trading was suspended on January 8, 2009. The Company does not intend to appeal the Nasdaq staff's determination.

## C.    SUMMARY OF PREPETITION INDEBTEDNESS AND OTHER FINANCINGS AS OF THE PETITION DATE

Concurrently with the IPO, on November 20, 2002, Constar completed a public offering of $175 million aggregate principal amount of 11% Senior Subordinated Notes (the "Senior Subordinated Notes"). The Senior Subordinated Notes were issued at 98.51% of face value and mature on December 1, 2012, with interest payable semi-annually. The Company also entered into a $250 million senior secured credit facility consisting of a $150 million seven-year term loan and a $100 million five-year revolving loan facility. Constar used the proceeds from the subordinated note offering and the term loan arrangement to repay inter-company indebtedness owed to Crown.

On February 11, 2005, Constar completed a refinancing which consisted of the sale of $220 million aggregate principal amount of Senior Secured Floating Rate Notes due 2012 (the "Senior Secured FRNs") and simultaneously entered into a four-year $70 million Senior Secured Asset Based Revolving Credit Facility with Citicorp USA, Inc. as Administrative Agent and certain other Lenders (the "ABR Facility"). The proceeds, net of expenses, from the refinancing were used to repay $30 million outstanding under Constar's former revolving loan facility and $197 million then outstanding under two term loans.

Under the ABR Facility, Constar has pledged as collateral all of the capital stock of its domestic and United Kingdom subsidiaries and 65% of the voting stock of its other foreign subsidiaries, as well as all of the inventory, accounts receivable, investment property, instruments, chattel paper, documents, deposit accounts and certain intangibles of Constar and its U.K. subsidiaries. On March 20, 2007, Constar amended the ABR Facility to, among other things, increase the facility to $75 million, lower interest charges by 50 basis points, lower excess collateral availability from $20 million to $15 million and extend the termination date to February 11, 2012. The ABR Facility is not secured by any of the collateral which secures the Senior Secured FRNs; they are separate collateral pools.

The Senior Secured FRNs, which remain outstanding, bear interest at a rate of LIBOR plus 3.375%, with interest payable quarterly and principal maturing February 15, 2012. Pursuant to an interest rate swap executed in May 2005 with Citigroup Financial Products Inc., $100 million face amount of the Senior Secured FRNs had an effective fixed interest rate of 7.9%. The Senior Secured FRNs are secured by certain collateral of the Debtors as defined in the Senior Secured FRN Indenture and related security documents, but not by any of the collateral which secures the ABR Facility.

As of the Petition Date, the Debtors' prepetition indebtedness for borrowed money consists of:

- $220 million in principal amount of debt consisting of the Senior Secured FRNs, bearing interest at LIBOR plus 3.375% per annum (as noted above, the Debtors have a swap agreement which effectively fixes the interest rate for $100 million of this series of Senior Secured FRNs at 7.9%); and

- $175 million in principal amount of debt consisting of the Senior Subordinated Notes, bearing interest at 11% per annum;

and as of December 17, 2008:

- approximately $23 million of borrowings under the ABR Facility, bearing interest at LIBOR plus 2.25% per annum;[7] and

- approximately $6.1 million outstanding under undrawn letters of credit.

## III. CHAPTER 11 CASES

**A.      EVENTS LEADING TO THE CHAPTER 11 CASES**

Over the past few years, a number of factors have caused Constar's revenues to decline and its net losses to increase, which events in turn, adversely affected Constar's ability to generate profits in the future. These factors include declining consumer demand for carbonated beverages and bottled water, the continuing shift of Constar's customers to self-manufacturing, and the loss of some customers.

**1.      Declining Consumer Demand for Carbonated Beverages and Bottled Water and its Effect on the Debtors' Businesses**

Constar's conventional product profitability is driven principally by price, volume and maintaining efficient manufacturing operations. Approximately 74% of Constar's sales in 2007 related to conventional PET containers which are primarily used for carbonated soft drinks and bottled water. Due to recent macroeconomic conditions, especially the marked slow down in the U.S. and European economies, fears of a broad and deep worldwide recession and the historically high gasoline prices that prevailed until recently, Constar's customers experienced weak demand in the convenience store and gas station distribution channels, where a high percentage of PET products are sold, and this has negatively impacted Constar's sales.

**2.      Shift to Self-Manufacturing and its Effect on the Debtors Businesses**

Additionally, Constar's conventional unit volume has declined (by 4.2% in the past year) due to the continued movement of water bottlers to self-manufacturing, as well as consumers shifting their preferences from carbonated soft drinks to energy drinks and teas. The shift is expected to continue among water bottlers both due to economic and competitive factors at the retail level, as well as the fact that several water bottlers may either be consolidated or go out of business. As a result, profitability from bottled water bottle sales has declined and is expected to decline further in the future. Customers are also expected to move toward self-manufacturing of certain carbonated soft drink packages where cost effective.

**3.      Increases in the Debtors' Net Losses, High Leverage and Liquidity Constraints Have Reduced Their Room for Maneuver**

As a result of the circumstances discussed above, Constar incurred net losses of $10.3 million for the 2006 fiscal year and net losses of $26.3 million for the 2007 fiscal year. Continuing net losses have limited its ability to service debt and to fund operations. Net cash provided by operating activities decreased from $44.3 million in 2006 to $10.3 million in 2007. Servicing outstanding indebtedness requires annual payments of $37.3 million of interest. While additional borrowings under the ABR Facility may alleviate short-term cash needs, any such borrowings will only increase Constar's debt. Considering Constar's performance in 2006 and 2007, refinancing current debt is likely impossible to accomplish on commercially reasonably terms and may not be possible at all.

Thus, the Debtors have become unable to support their current debt load.

---

[7]      As described infra, borrowings under the ABR facility are tied to receivables generated in the United States and Europe.

### 4. Debtors Begin Development of Proposed Plan

In light of the foregoing developments, Constar and its representatives began discussions with certain holders of its Senior Subordinated Notes during October 2008 with respect to possible restructuring alternatives. These discussions led to the formation of an ad hoc committee of holders of the Senior Subordinated Notes (the "Ad Hoc Committee"). Upon information and belief, the members of the Ad Hoc Committee hold, in the aggregate, over 50% of the principal face amount of the Senior Subordinated Notes. The Ad Hoc Committee has retained Goodwin Procter LLP as its counsel.

The first meeting between Constar (or its representatives) and the Ad Hoc Committee (or its representatives) occurred on October 27, 2008. At that meeting and in subsequent discussions, the parties discussed the conversion of the Senior Subordinated Notes into new equity of Constar. Such a transaction would be highly beneficial to the Debtors as it would significantly de-lever Constar's balance sheet and materially reduce its annual debt service obligations.

On or about December 15, 2008, Constar and a majority of the holders of the Senior Subordinated Notes reached an agreement in principle on the terms of a framework for a restructuring whereby Constar and certain of its subsidiaries would file chapter 11 petitions and, simultaneously, a pre-arranged plan of reorganization (a) providing for the conversion of the Senior Subordinated Notes into all of the equity of the reorganized entities, excluding those shares reserved for Constar's management, while (b) leaving the Debtors' trade vendors and the holders of the Senior Secured FRNs unimpaired. While the constituents of the Ad Hoc Committee are not legally bound to support the restructuring plan, the conversion of the Senior Subordinated Notes into equity, the payment of trade vendors in full and the reinstatement of the Senior Secured FRNs has the support of the holders of more than 50 percent of the outstanding Senior Subordinated Notes.

## B.   EVENTS OF THE CHAPTER 11 CASES

In order to facilitate the Chapter 11 Cases and minimize disruption to the Company's operations, the Debtors have sought or will seek certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Cases, however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

### 1.   Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. As noted above, the Debtors have been in extensive negotiations with the Senior Subordinated Noteholders to complete an exchange offer that will deleverage their balance sheet and complete a financial restructuring.

No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors. On the Petition Date, the Debtors promptly requested that the Bankruptcy Court set a hearing date to approve this Disclosure Statement and to confirm the Plan. The Bankruptcy Court has set February 3, 2009 as the hearing date to approve this Disclosure Statement and April __, 2009 as the date to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be approximately ten (10) days after the date the Bankruptcy Court enters the Confirmation Order. Should these projected timelines prove accurate, the Debtors could emerge from chapter 11 within ninety to one hundred twenty days of the Petition Date.

### 2.   First Day Relief

On the Petition Date, the Debtors presented certain motions (the "First Day Motions") to the Bankruptcy Court seeking relief. The First Day Motions include, but are not necessarily limited to, the following:

#### (a)   Approval of Solicitation Procedures and Scheduling of Confirmation Hearing

To expedite the Chapter 11 Cases, the Debtors sought an immediate order setting dates for hearings to (i) approve solicitation procedures and the Disclosure Statement; and (ii) confirm the Plan. As noted above, the Court

has set February 3, 2009 as the hearing date with respect to the Disclosure Statement. The Debtors will ask the Court to approve certain solicitation procedures in connection with the Court's approval of the Disclosure Statement.

        (b)        <u>Debtor in Possession Financing</u>

The Debtors have received debtor in possession financing from a syndicate of Lenders including affiliates of Citigroup Global Markets Inc. and Wells Fargo Foothill, LLC, with Citicorp USA, Inc. as Administrative Agent, to enter into the DIP Facility with a total commitment of $75 million. On January 20, 2009, the Court entered a final order authorizing the Debtors to make immediate borrowings under the DIP Facility. The Debtors believe that the committed amount of the DIP Facility will meet the Debtors' financing needs during the Chapter 11 Cases' brief duration.

        (c)        <u>Customer Programs and Practices</u>

On December 31, 2008, the Court entered an order authorizing, but not directing, the Debtors to honor certain prepetition obligations to their customers and to otherwise continue certain customer programs and practices in the ordinary course of business. The order authorizes the Debtors to honor, exercise, and perform all their respective rights and obligations (whether prepetition or postpetition) arising in the ordinary course of business under, in connection with, and in furtherance of their existing customer agreements. The Debtors believe such relief is necessary to stabilize their customer base at the outset of these Chapter 11 Cases and to avoid needless disruptions of the Debtors' ongoing operations.

        (d)        <u>Critical Suppliers and Warehousemen</u>

On the Petition Date, the ~~Debtors sought~~<u>Court entered</u> an order authorizing, but not ~~directing, the Debtors to pay certain prepetition expenses and directing banks and financial institutions to honor related checks and payment requests. Under this motion, the Debtors intend to obtain~~<u>requiring, payment of prepetition claims of certain vendors. Under this order,</u> the Debtors obtained authority to satisfy outstanding obligations, if any, to ~~a limited number of~~<u>certain</u> critical ~~suppliers~~<u>shippers</u> and warehousemen that provide the Debtors with critical services on a frequent, if not daily, basis. The Debtors believe that payment to these critical ~~suppliers~~<u>shippers</u> and warehousemen is necessary to avoid needless disruptions to the Debtors' business and to ensure the timely delivery of goods and services to their customers.<u>  On January 31, 2009, the Debtors sought an order authorizing, but not requiring, payment of prepetition claims of essential vendors. Under this motion, the Debtors intend to obtain authority to pay, in the reasonable exercise of their business judgment and in their sole discretion, the prepetition claims, or a portion thereof, of certain resin suppliers that are essential to the uninterrupted functioning of the Debtors' various manufacturing and business operations and who are not bound by contractual supply agreements with the Debtors.</u>

        (e)        <u>Existing Cash Management System and Investment Practices</u>

On December 31, 2008, the Court entered an order authorizing the Debtors to maintain their prepetition cash management systems after commencement of the Chapter 11 Cases, including use of bank accounts and business forms and authority for the Debtors to continues their existing investment practices. This facilitates the efficient operation of the Debtors by not requiring them to make artificial adjustments within their large and complex cash management system.

        (f)        <u>Wages and Benefits</u>

On December 31, 2008, the Court entered an order authorizing the Debtors to pay all employees their wages in the ordinary course of business. Additionally, the order authorizes the Debtors to continue all their prepetition benefit programs, including, among others, the medical, dental, 401(k), and severance plans. This relief has allowed the Debtors to maintain employee morale and prevent costly distractions and retention issues.

        (g)        <u>Sales, Use and Franchise Tax</u>

On December 31, 2008, the Court entered an order authorizing the Debtors to pay certain sales, use, and other governmental taxes as well as fees, license and other similar charges and assessments in the ordinary course of business. Some, if not all, of the taxing authorities may cause the Debtors to be audited if taxes are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from their reorganization efforts. The authority to pay those taxes in the ordinary course of business granted in this order prevents costly distractions to the Debtors.

        (h)        <u>Equity Trading Restrictions</u>

On January 22, 2009, the Court entered a final order establishing notification and hearing procedures that must be satisfied before certain transfers of Constar International Inc.'s equity securities are deemed effective.

        (i)        <u>Insurance</u>

The Debtors maintain a variety of insurance policies, including general liability, automotive liability, worker's compensation, directors and officers liability, and other policies. On December 31, 2008, the Court entered an order authorizing the Debtors to pay all prepetition premiums in the ordinary course of business. The relief granted in this ordered allows the Debtors to avoid potential lapse of coverage and the expense of acquiring new coverage and to continue prepetition premium financing arrangements.

        (j)        <u>Utilities</u>

On January 20, 2009, the Court entered a final order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Debtors are not required to provide any additional adequate assurance. The Debtors believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization.

        (k)        <u>Interim Compensation Procedures</u>

On January 20, 2009, the Court entered an order authorizing the Debtors to establish procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases. The Debtors believe that the efficient administration of the Chapter 11 Cases will be significantly aided by the interim compensation and expense reimbursement procedures.

        (l)        <u>Ordinary Course Professionals</u>

On January 20, 2009, the Court entered an order authorizing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of the Debtors' business (each, an "OCP"). Due to the number of OCPs that are regularly retained by the Debtors, it would be unwieldy and burdensome to both the Debtors and this Court to request each such OCP to apply separately for approval of its employment and compensation.

        (m)        <u>Other Procedural Motions and Professional Retention Applications</u>

The Court has also granted several procedural motions that are standard in Chapter 11 Cases, as well as applications to retain the various Professionals who will be assisting the Debtors during these Chapter 11 Cases.

**3.        Appointment of ~~Creditors~~ Committee**

On January 15, 2009, the Office of the United States Trustee appointed a Committee of Unsecured Creditors (the "~~Creditors~~ Committee") composed of: (i) U.S. Bank National Association, as Indenture Trustee, (ii) Aegon USA Investment Management, LLC, (iii) Peritus Asset Management LLC, (iv) R&D Tool and Engineering Co., and (v) ROI Printing Companies. The ~~Creditors~~ Committee has retained Goodwin Procter LLP as its counsel, subject to Court approval.

# IV. THE JOINT ~~FIRST~~SECOND AMENDED PLAN

## A. INTRODUCTION

The summary of the ~~First~~Second Amended Plan contained herein is qualified in its entirety by reference to the ~~First~~Second Amended Plan and the exhibits to this ~~First~~Second Amended Disclosure Statement and the ~~First~~Second Amended Plan. It is the ~~First~~Second Amended Plan and orders entered by the Bankruptcy Court and not this ~~First~~Second Amended Disclosure Statement that govern the rights and obligations of the parties.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE ~~FIRST~~SECOND AMENDED PLAN AND THE ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE ~~FIRST~~SECOND AMENDED PLAN.

## B. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the ~~First~~Second Amended Plan .

### 1. DIP Facility Claims

This category of claims consists of all claims against any of the Debtors arising under or related to the DIP Credit Agreement. Subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the DIP Facility shall, at the option of the Debtors, either be repaid in Cash in full on the Effective Date or, subject to satisfaction of certain conditions, be converted into the Exit Facility. Alternatively, in lieu of converting the DIP Facility into the Exit Facility, the Debtors may enter into an Alternative Exit Facility, in which event the DIP Facility Claims shall be paid in full by the Alternative Exit Facility.

### 2. Administrative Claims

This category of claims consists of all claims against any of the Debtors for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code. Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of such Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of such Allowed Administrative Claim in accordance with the terms of the applicable contract or agreement governing such Claim, if any.

### 3. Priority Tax Claims

This category consists of claims against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be paid in full in Cash pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

US1DOCS 6890484v~~15~~16

## C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The ~~First~~Second Amended Plan provides for the classification and treatment of seven Classes of Claims and Interests (treating the Debtors as a single entity). A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the ~~First~~Second Amended Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Each class contains six separate subclasses – one each for each of the entities that are Debtors in these proceedings.

The classification of Claims and Interests against the Debtors pursuant to the ~~First~~Second Amended Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Senior Secured FRN Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Senior Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## D.    TREATMENT OF CLAIMS AND INTERESTS

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

### 1.    Class 1 – Other Priority Claims

Class 1 – Other Priority Claims consists of all priority claims against any of the Debtors other than Administrative Claims and Priority Tax Claims. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash.

### 2.    Class 2 – Senior Secured FRN Claims

Class 2 – Senior Secured FRN Claims consists of all claims against any of the Debtors arising under or in connection with the Senior Secured FRNs, other than a Section 510(b) Claim. For purposes of the ~~First~~Second Amended Plan, all Senior Secured FRN Claims shall be Allowed in full. The Senior Secured FRNs shall be deaccelerated and ~~such allowed claims will be satisfied by being~~ Reinstated in full as of the date immediately prior to the Petition Date.

### 3.    Class 3 – Other Secured Claims

Class 3 – Other Secured Claims consist of all Secured Claims against any of the Debtors that are not DIP Facility Claims, Existing Facility Claims or Senior Secured FRN Claims. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the Debtors or the Reorganized Debtors, as applicable: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claim in full in Cash; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim and pay any interest required to be paid under section 506(b) of the Bankruptcy Code; (iii) the Debtors or the Reorganized Debtors shall Reinstate any Allowed Other Secured Claim in full; or (iv)

- 11 -

the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired.

**4.      Class 4 – Senior Subordinated Note Claims**

Class 4 – Senior Subordinated Note Claims consists of all claims against any of the Debtors arising under or in connection with the Senior Subordinated Notes, other than a Section 510(b) Claim. In full and final satisfaction, settlement, release, and discharge of and in exchange for the Senior Subordinated Notes, each ~~Holder of an Allowed~~ Senior Subordinated ~~Note Claim~~Noteholder shall receive his pro rata portion of the Distribution Shares. Upon the Effective Date, the Senior Subordinated Noteholders shall receive 100% of the New Equity subject to any dilution arising from the Management Incentive Plan and the Reorganized Debtors shall pay in cash in full all reasonable fees and expenses of the Senior Subordinated Note Trustee. Holders that beneficially own a majority of the Senior Subordinated ~~Note holders~~Notes are supportive of the ~~First~~Second Amended Plan.

**5.      Class 5 – Other General Unsecured Claims**

Class 5 – Other General Unsecured Claims consists of all unsecured claims against any of the Debtors other than Class 4 – Senior Subordinated Note Claims and Class 6 – Section 510(b) Claims. Allowed Other General Unsecured Claims will be paid in full in Cash on the later of (i) the Effective Date of the ~~First~~Second Amended Plan, or (ii) when such unsecured claim would be paid in the ordinary course of the Reorganized Debtors' business.

**6.      Class 6 – Section 510(b) Claims**

Class 6 – Section 510(b) Claims consists of all claims against any of the Debtors arising from rescission of a purchase or sale of a security of Constar or any of its affiliates, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and any related reimbursed or contribution claims. On the Effective Date, all Class 6 – Section 510(b) Claims shall be extinguished and no distributions shall be made on account of Class 6 Claims. For the avoidance of doubt, any Claim arising out of that certain consolidated securities class action lawsuit filed in the United States District Court for the Eastern District of Pennsylvania, In re Constar International Inc. Securities Litigation (Master File No. 03-CV-05020), and any reimbursement or contribution claim arising from such lawsuit is considered a Class 6 – Section 510(b) Claim.

**7.      Class 7 – Equity Interests**

Class 7 – consists of all Equity Interests ~~consist of (a) any equity security in a Debtor, including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company, or similar interest in a Debtor; provided, however, that Class 7 - Equity Interests does not include any equity security in a Debtor held by another Debtor or any equity security in a Debtor held by an Affiliate of a Debtor.~~ On the Effective Date, all Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Class 7 – Equity Interests.

**E.      SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS**

Except as otherwise provided in the ~~First~~Second Amended Plan, nothing under the ~~First~~Second Amended Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**F.      ACCEPTANCE OR REJECTION OF THE ~~FIRST~~SECOND AMENDED PLAN**

Class 4 is Impaired under the ~~First~~Second Amended Plan and is the sole class entitled to vote to accept or reject the ~~First~~Second Amended Plan. Classes 1, 2, 3, and 5 are Unimpaired under the ~~First~~Second Amended Plan, are conclusively presumed to have accepted the ~~First~~Second Amended Plan and are not entitled to vote to accept or

reject the ~~First~~Second Amended Plan. Classes 6 and 7 are Impaired and shall receive no distribution under the ~~First~~Second Amended Plan. The Holders of Claims and Interests in Classes 6 and 7 are conclusively presumed to have rejected the ~~First~~Second Amended Plan and are not entitled to vote to accept or reject the ~~First~~Second Amended Plan .

## G. MEANS FOR IMPLEMENTATION OF THE ~~FIRST~~SECOND AMENDED PLAN

### 1. Treatment of Executory Contacts and Unexpired Leases

Except as otherwise provided in the ~~First~~Second Amended Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the ~~First~~Second Amended Plan, as of the Effective Date, each Debtor shall be deemed to have assumed as of the Effective Date each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Confirmation Date; or (4) is set forth in a schedule, as an Executory Contract or Unexpired Lease to be rejected, filed as part of the ~~First~~Second Amended Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above as of the Effective Date. Notwithstanding the foregoing paragraph, after the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any intercompany contracts, leases, or other agreements without approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease, to be assumed pursuant to the Second Amended Plan, all Cure Claims will be satisfied by payment of the Cure Claims in Cash on the Effective Date or as soon as reasonably practicable thereafter as set forth in the Second Amended Plan or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without any further notice to or action, order or approval of the Bankruptcy Court. With respect to each such Executory Contract and Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement, the Debtors will have designated a proposed amount of the Cure Claim, and the assumption of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Claim.

Requests for payment of Cure Claims with respect to any Executory Contract or Unexpired Lease to be assumed pursuant to the Second Amended Plan in an amount different than specified on the Plan Supplement must be Filed and served on the Debtors no later than 10 days after the filing of the Plan Supplement. Holders of Cure Claims with respect to any Executory Contract or Unexpired Lease that do not File and serve such a request by such date will be forever barred, estopped and enjoined from asserting such Cure Claims against the Debtors, the Reorganized Debtors or their respective property, and such Cure Claims will be deemed discharged as of the Effective Date.

With respect to any Executory Contract or Unexpired Lease, in the event of a dispute regarding: (1) the amount of any Allowed Cure Claim; (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, however, that the Debtors or the Reorganized Debtors may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2. Issuance of New Equity

The issuance of the New Equity, including the Distribution Shares and the shares of the New Equity, options, or other equity awards, if any, reserved for the Management Incentive Plan, by Reorganized Constar is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests. All of the shares of New Equity issued pursuant to the ~~First~~Second Amended Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.

### 3. Listing of New Equity

The Reorganized Debtors shall, on or as soon as reasonably practicable after the Effective Date, ~~use commercially reasonable efforts to~~ list the New Equity on a national securities exchange. The Reorganized Debtors shall apply for termination of registration of the Old Common Stock under the Exchange Act as soon as reasonably practicable after the Effective Date if the requirements for termination of registration are satisfied.

### 4. Corporate Existence

Except as otherwise provided in the ~~First~~Second Amended Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the ~~First~~Second Amended Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the ~~First~~Second Amended Plan and require no further action or approval.

### 5. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the ~~First~~Second Amended Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the ~~First~~Second Amended Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the Exit Facility and Claims pursuant to the DIP Facility that by their terms survive termination of the DIP Facility). On and after the Effective Date, except as otherwise provided in the ~~First~~Second Amended Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 6. Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the ~~First~~Second Amended Plan, including: (1) the execution and delivery of appropriate agreements or other documents of consolidation or reorganization containing terms that are consistent with the terms of the ~~First~~Second Amended Plan and that satisfy the requirements of applicable law, which such agreements or documents shall be acceptable to the Supporting Noteholders in their reasonable discretion; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the ~~First~~Second Amended Plan, which such instruments shall be acceptable to the Supporting Noteholders in their reasonable discretion; (3) the filing of appropriate certificates of incorporation or consolidation with the appropriate governmental authorities pursuant to applicable law, which such certificates shall be acceptable to the Supporting Noteholders in their reasonable discretion; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate, subject to the consent of the Supporting Noteholders in their reasonable discretion.

### 7. Corporate Action

Each of the matters provided for by the ~~First~~Second Amended Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the ~~First~~Second Amended Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity. Notwithstanding the preceding sentence, the members of the New Board shall be as set forth in the ~~First~~Second Amended Plan Supplement or as otherwise determined by the Debtors (with the

approval of the Supporting Noteholders in their exclusive discretion) and the New Board of Constar shall be approved by the members of the Existing Board.

## 8.     Employee and Retiree Benefits

On and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the ~~First~~Second Amended Disclosure Statement for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that (a) the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan, and (b) the transactions contemplated under the ~~First~~Second Amended Plan shall be deemed not to constitute a change of control for purposes of any of the foregoing. Nothing in the ~~First~~Second Amended Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding anything to the contrary in the ~~First~~Second Amended Plan, upon the Effective Date, the Annual Incentive and Management Stock Purchase Plan, the Constar International Inc. 2007 Stock-Based Incentive Compensation Plan and the Constar International Inc. 2002 Stock-Based Incentive Compensation Plan, and any and all related agreements, documents or instruments shall be terminated.

Constar established and maintained a pension plan for certain of its employees known as the Constar International, Inc., Pension Plan. The pension plan is now known as the Constar, Inc., Pension Plan ("Pension Plan") and is sponsored and maintained by Constar, Inc., a subsidiary of Constar. The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") (29 U.S.C. section 1301 et seq.).

The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

Under the ~~First~~Second Amended Plan, the Pension Plan will not be terminated, and the reorganized Constar, Inc., will assume and continue to maintain the Pension Plan. The reorganized Constar, Inc., and all members of its controlled group are obligated to contribute to the Pension Plan the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Internal Revenue Code, 26 U.S.C. §§ 412 and 430. The Pension Plan may be terminated only if the statutory requirements of either ERISA section 4041, 29 U.S.C. § 1341, or ERISA section 4042, 29 U.S.C. § 1342, are met. If the Pension Plan terminates, the reorganized Constar, Inc., and all members of its controlled group are jointly and severally liable for the unpaid minimum funding contributions, statutory premiums, and unfunded benefit liabilities of the Pension Plan. *See* ERISA sections 4062(a), 4007; 29 U.S.C. §§ 1362(a), 1307.

Nothing in the ~~First~~Second Amended Plan will be construed as discharging, releasing, or relieving Constar, Inc., or its successor, including the reorganized Constar, Inc., or any party, in any capacity, from any liability for the minimum funding requirements or statutory premiums under ERISA or the Internal Revenue Code with respect to the Pension Plan or the PBGC. The PBGC and Pension Plan will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the ~~First~~Second Amended Plan or the Confirmation Order.

**9.      D&O Tail Coverage Policies**

On the Effective Date, the Debtors shall assume the D&O Liability Insurance Policies, which provide tail coverage to the Debtors' officers and directors. In addition, as of the Effective Date, the Debtors shall either assume such other directors and officers liability insurance policies (if procured prior thereto), or enter into such other new directors and officers liability policies as the Debtors shall determine, in each case as acceptable to the Supporting Noteholders in their sole discretion. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of insurance policies. Notwithstanding anything to the contrary contained in the ~~First~~Second Amended Plan, Confirmation of the ~~First~~Second Amended Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the ~~First~~Second Amended Plan as to which no Proof of Claim need be Filed.

**10.      Sources of Consideration for ~~First~~Second Amended Plan Distributions**

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Exit Facility, the issuance of the New Equity or other Cash from the Debtors, including Cash from operations.

**11.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the ~~First~~Second Amended Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the ~~First~~Second Amended Plan, the Plan Supplement, or the ~~First~~Second Amended Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the ~~First~~Second Amended Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the ~~First~~Second Amended Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the ~~First~~Second Amended Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Debtors expressly waive their right to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action relating to a preference payment made before the filing of this case.

- 16 -